COMMONWEALTH *vs.* NORMAN JAVIER PEREZ.

Middlesex. September 9, 1991. - November 20, 1991.

Present: LIACOS, C.J., NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Assistance of counsel, Waiver of constitutional rights. *Error*, Harmless. *Waiver. Evidence*, Telephone conversation.

At a murder trial, the judge correctly concluded, on the evidence presented at the hearing on a motion to suppress evidence, that the Spanish-speaking defendant had been properly advised of his Miranda rights, had knowingly and intelligently waived those rights, and had voluntarily made statements to the police. [254-256]

Discussion of the holding of the United States Supreme Court in *Edwards v. Arizona*, 451 U.S. 477 (1981), that, once a defendant in custody invoked his right to counsel, the police could not question him again without counsel present. [256-259]

Error, if any, in admitting in evidence a criminal defendant's statements to police officers, who reinterrogated him six months after the defendant had terminated his initial interrogation by invoking his right to counsel, was harmless beyond a reasonable doubt in circumstances where the defendant's later statements contained nothing of importance not also contained in the properly admissible statements from the initial interrogation and where in any event the Commonwealth's evidence against the defendant, independent of the later statements, was overwhelming. [259-261]

At a criminal trial, the Commonwealth established an adequate foundation for the introduction of testimony concerning the identification of the defendant's voice over the telephone [261-262], and questions of the witness's credibility or the reliability of her testimony were for the jury to determine [262-263]

INDICTMENT found and returned in the Superior Court Department on October 21, 1987.

A pretrial motion to suppress evidence was heard by *John P. Forte*, J., sitting under statutory authority, and the case was tried before him.

*Lawrence R. Glynn* for the defendant.

*Patricia M. Darrigo*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reason of deliberately premeditated malice aforethought and extreme atrocity or cruelty. On appeal, the defendant argues that the trial judge erroneously admitted in evidence: (1) statements that were obtained from him by police in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and *Edwards* v. *Arizona*, 451 U.S. 477 (1981); and (2) statements made by him to a witness who testified for the Commonwealth. We affirm the conviction, and find no basis for granting relief pursuant to G. L. c. 278, § 33E (1990 ed.).

The Commonwealth presented evidence at trial that permitted the jury to find the following facts. On or around August 26, 1987, two or three days before the murder, the defendant made a telephone call to Wanda Rodriguez. The defendant told Rodriguez that a person named "Tullene" had offered to pay the defendant $5,000 and provide him with drugs if the defendant would kill someone. The defendant did not tell Rodriguez the identity of the intended victim. Rodriguez knew that "Tullene" was a nickname of one Angel Kipp.

On August 29, 1987, the day of the murder, the defendant came to the apartment building where the victim, Angel "Shorty" Cruz, lived with his girl friend, Clarissa Otero. Otero looked out the window and watched as the defendant stood out in front of the building, calling out the victim's name. The victim did not come out of his apartment, and after a short time, the defendant departed. Fifteen minutes later, at approximately 5 P.M., the victim and his girl friend left their apartment, drove around the neighborhood for a few minutes, then arrived at the apartment of two friends, Lori Lynn and Raymond Devarie. Lynn and Devarie lived on the third floor of a three-story building on Decatur Street in Lowell, in apartment no. 6. Lynn's brother Edgar was also there, sleeping on the living room couch.

Approximately five minutes after the victim and Otero arrived at Devarie's apartment, the defendant walked past three owners of the apartment building, who were working in the adjoining parking lot, and entered the building through the side entrance. The defendant then knocked on the rear door of an apartment on the first floor, and spoke to the tenant who answered the door. This tenant took the defendant up the rear stairs to the third floor, then returned to his first-floor apartment.

Once on the third floor, the defendant knocked on the rear door of apartment no. 6. Lynn answered, and the defendant asked whether Devarie lived there. When Lynn indicated that he did, the defendant asked for the victim. The victim heard the defendant and Lynn, walked to the rear door and joined the defendant in the rear hallway. Lynn partially closed the door after him. The victim then shouted at the defendant; the victim was angry that the defendant had come looking for him at Devarie's apartment. Very soon after the victim went into the hallway, the defendant shot him four times, in the forearm, chest, head, and back. There was testimony that either the wound to the chest or the one to the head alone would have been sufficient to cause the victim's death.

After shooting the victim, the defendant walked back down the rear stairway, and out the side door, passing the owners of the building. He sped away in a white car driven by Kipp.

A few days after the shooting, the defendant again telephoned Rodriguez, and told her he was calling from Florida. The defendant asked Rodriguez, "Do the cops know I did it?" She replied, "Of course." When Rodriguez asked how the defendant could have done this to the victim's girl friend, he responded that he had needed money. When Rodriguez asked him what he would do, he said he would either turn himself in or kill himself.

1. *Miranda issues.* Following the murder, the defendant was questioned by the police while he was held in a Puerto Rican prison, and again after he had been returned to Low-

ell. The defendant filed a motion to suppress his statements, alleging that they were not the product of a knowing and intelligent waiver of the rights protected by the Miranda warnings. See *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966). The judge heard evidence on the motion and denied it. On appeal, the defendant argues that (1) cards containing the Miranda warnings in Spanish did not adequately advise him of his rights because the Spanish version of the warnings was incomplete and inaccurate; (2) providing him with cards containing Miranda warnings in Spanish was insufficient, without regard to the contents of the cards, in the absence of an inquiry into the defendant's ability to read Spanish; and (3) the testimony of a police officer who did not understand Spanish that another police officer read the Miranda warnings to the defendant in Spanish was insufficient to establish that fact.

The judge made the following written findings of fact in connection with the motion to suppress. On September 28, 1987, Inspector Brendan Durkin of the Lowell police and State Trooper William Flynn went to Puerto Rico where they met with the defendant, who was a prisoner at Rio Piedra Prison. At the prison Durkin and Flynn were accompanied by a Puerto Rican prison officer. Durkin gave the defendant a card containing the Miranda warnings in Spanish. The defendant read the card and indicated in English that he understood his rights. Durkin then asked the Puerto Rican officer to read the card aloud to the defendant in Spanish, after which this officer asked the defendant in Spanish whether he understood his rights. The defendant responded in English that he did. On request, the defendant signed the card containing the Miranda warnings. The defendant's signature was witnessed by Durkin, Flynn, and the Puerto Rican officer. Durkin then proceeded to interrogate the defendant, who at first denied any knowledge of the homicide. Later, however, the defendant stated that he had been pres-

ent when the murder occurred, but that another "hombre" did the shooting.[1] At no time during this questioning did the defendant ask for an attorney or an interpreter, but a few times he looked to the Puerto Rican officer for a translation of some of Durkin's questions. Throughout the questioning, the defendant spoke in "broken" English and was responsive and coherent.

A riot at Rio Piedra Prison caused the questioning to terminate after about one hour. Durkin asked the defendant whether the officers could speak to him the next day. The defendant assented. The defendant then asked for an attorney. However, due to the prison riot, the prison officials would not allow Durkin and Flynn to visit the defendant the next day.

On September 30, 1987, Durkin and Flynn returned to the prison to see the defendant. Flynn advised the defendant of his Miranda rights and the defendant signed the Miranda card. The defendant stated he did not want to talk, and indicated that he wanted an attorney. Durkin and Flynn left without any questioning.

On the evening of March 31, 1988, the defendant was extradited from Puerto Rico to Massachusetts on a Governors' executive agreement. Durkin, accompanied by Officer John Guilfoyle of the Lowell police, went to Logan International Airport and met the State police who had the defendant in custody. The defendant was transported to the State police office at the Middlesex County Superior Court in Cambridge, where he was turned over to the Lowell police. There was no interrogation during the drive from Cambridge to the Lowell police department.

---

[1] The testimony underlying this finding was as follows. The defendant admitted to the police that he had gone to Devarie's apartment looking for the victim, and that he had been in the hallway with the victim when the murder occurred. He also admitted that he had been wearing the clothes that the owners of the apartment building had described on the man seen fleeing the scene just after the murder. The defendant stated that he had wanted to buy drugs from the victim, and that another man had shot the victim while he and the defendant stood in the hallway. The defendant also denied that Kipp was involved in the murder.

After booking at the Lowell police department, the defendant was given a card containing the Miranda warnings in Spanish. The defendant read the card, said he understood the warnings, and signed the card at about 12:15 A.M. on April 1, 1988.

He was then interrogated. During this interrogation, which lasted about three hours, the defendant refused food but did take some beverages. The defendant admitted that he had been with the victim at the time of the shooting, that he and the victim had argued, but again repeated his story that another man had shot the victim.[2] At no time did the defendant ask for a lawyer or an interpreter, and he did not indicate that he wanted the questioning to stop.

About noon on April 1, 1988, the defendant was again interviewed by Durkin, who was accompanied on this occasion by Inspector Hilda Fernandez, a Spanish speaking member of the narcotics squad of the Lowell police. The defendant was given a card containing the Miranda warnings in Spanish. He read the card, again stated he understood it, and signed the card. Fernandez was brought to the interrogation because of drug trafficking implications of the killing. During the interview, the defendant denied that Angel Kipp had been involved in the murder and repeated his earlier version of the incident, namely, that while he was with the victim in the hallway, another person had appeared and shot the victim.[3] Later, the defendant asked for an attorney and the questioning was terminated.

Based on these findings (which are supported by the evidence), the judge concluded that the defendant had been properly advised of his Miranda rights, had knowingly and intelligently waived those rights, and had given voluntary statements on all occasions to the police.

---

[2] Although not in the judge's findings, the defendant also told the police, when the truthfulness of his story was questioned, that, "If everybody says I killed Shorty, then I go to jail, no problem."

[3] The defendant also stated that, after the shooting, he took $300 of his savings and bought a one-way ticket to Puerto Rico.

We reject the defendant's contention that he was mis-informed of his rights because the Spanish translations on the various Miranda cards which were given to him were incomplete and inaccurate. There was testimony before the judge from two witnesses, including a court interpreter, which indicated that the cards contained all of the required warnings.[4] The interpreter also gave testimony indicating that slight ambiguities in a few of the Spanish words on the cards, the use of one colloquial Spanish term, and the lack of accent marks where grammatically preferred, did not alter the meaning of the warnings in any way. This testimony, which was supported by other testimony of generally similar import, warranted a finding that the defendant had received a complete and accurate statement of Miranda warnings.

We also reject the defendant's argument that the use of cards to provide Miranda warnings was deficient without a separate inquiry into his ability to read what was on the cards. There was no evidence that the defendant was unable to read what was on the cards or to comprehend the warnings. We have ruled the use of a card containing the Miranda warnings sufficient to advise a defendant of his rights, if it appears that the defendant has read the card and indicates an understanding of what he has read. See *Commonwealth* v. *Day*, 387 Mass. 915, 918-919 & n.8 (1983). See also *Bell* v. *United States*, 382 F.2d 985 (9th Cir. 1967), cert. denied, 390 U.S. 965 (1968). There was testimony, accepted by the judge, that the defendant either read, or was

---

[4]The interpreter provided a translation of the warnings on the cards as follows: "Before we question you, you must understand your rights. . . . You have the right to remain silent. . . . Anything that you speak may be used against you in court. . . . You have the right to speak with an attorney and to ask his advice before you are questioned, and you may have the attorney present during your questioning. . . . If you can not pay for an attorney, one will be given to you before you are questioned, if you so desire. . . . If you decide to answer any question, without an attorney being present, you still will have the right to stop the questioning at any time, until you have an attorney and have spoken with him. . . . Do you understand what I have read to you? . . . Having in mind these rights, do you desire to speak with me now?"

advised of, the warnings on the Miranda cards, stated that he understood the warnings, and signed the cards. This testimony was sufficient to support a finding that the defendant had been advised of, and comprehended, his rights without any need for the separate inquiry urged by the defendant.

Finally, we reject the defendant's argument that Inspector Durkin's testimony that a Puerto Rican officer read the defendant his Miranda rights in Spanish before the first interrogation, was insufficient to show that proper warnings were administered because Durkin does not understand Spanish. An objection on this ground to Durkin's testimony was not made when the evidence was received and, as a consequence, the prosecution did not have the opportunity to produce the Puerto Rican officer and elicit his testimony about the warnings he read. The defendant's point, however, is of no consequence in view of the ample additional evidence which warranted findings that the defendant had received and understood his Miranda warnings, a fact further established by the defendant's twice invoking his right to counsel.

2. *Edwards issues.* The defendant also argues that the judge erred by not suppressing the statements the defendant made during the two interrogation sessions in Lowell, regardless of the sufficiency of the Miranda warnings he received on those occasions, because, under *Edwards* v. *Arizona*, 451 U.S. 477 (1981), any waiver of his Miranda rights was involuntary as a matter of law after he invoked his right to counsel at the last interrogation session in Puerto Rico. The defendant argues this point solely under Federal law, and we resolve it on that basis.[5] We shall discuss the import of the *Edwards* decision and assume that the admission of the chal-

[5]The issue was raised only obliquely before the judge. The memorandum of law filed by the defendant in support of his motion to suppress did not cite the *Edwards* decision, although the memorandum did argue, in a somewhat less than coherent way, that the defendant's requests for counsel had not been satisfactorily honored. The judge's ruling that all of the defendant's statements were voluntarily made covered the *Edwards* issues. The Commonwealth does not argue on appeal that the *Edwards* issues were not properly raised below, and the Commonwealth's brief on appeal deals with the issues as having been fully preserved for review here.

lenged statements violated *Edwards* and, consequently, constituted error. We conclude, however, that the error was clearly harmless beyond a reasonable doubt.

In *Edwards, supra,* the United States Supreme Court reinforced the safeguards of a defendant's right to counsel first provided in *Miranda.* The Court held in *Edwards* that, once a defendant in custody invoked a right to counsel, the police could not question the defendant again without counsel present unless the defendant initiated the contact. *Edwards, supra* at 484-485. Further, the holding in *Edwards* stated that fresh warnings and evidence of voluntariness in responding to questions could not overcome the presumption that any subsequent waiver was invalid. *Edwards, supra* at 484-487.

The Commonwealth concedes that the defendant clearly invoked his right to counsel at the last interrogation session in Puerto Rico, but argues that the *Edwards* rule should not be applied to the unusual facts of this case. In support of this conclusion, the Commonwealth points to the six-month gap between the defendant's invoking his right to counsel in Puerto Rico and his next interrogation in Lowell, the absence in the record of any evidence of police badgering the defendant, the fact that the police scrupulously readministered the Miranda warnings to the defendant before each interrogation session, the fact that the police never asked the defendant any questions at any of the four interrogation sessions prior to administering the warnings, and the fact that the police officers terminated the interrogation in Puerto Rico immediately on the defendant's invocation of his right because they could not have secured counsel for the defendant in Puerto Rico.

The United States Supreme Court has never passed on the applicability of *Edwards* to a case with a long gap in time between the invocation of the right to counsel and the subsequent interrogation without counsel. In *Edwards,* the police waited overnight before interrogating the defendant again after he had asserted his right to counsel. *Edwards, supra* at 479. Moreover, the Court has stated that the purpose of the presumption of involuntariness created in *Edwards* is to pro-

tect the defendant from being worn down in his effort to assert the right to counsel by repeated "badgering" by the police. *Minnick* v. *Mississippi*, 111 S. Ct. 486, 489-490 (1990). *Arizona* v. *Roberson*, 486 U.S. 675, 686 (1988). Clearly, the police in this case did not badger or harass the defendant. Also, there is no evidence in this case of police deceit, trickery, or pressure that often accompanies *Edwards*-type violations. Finally, the evidence indicates that the defendant's statements were not physically or psychologically coerced.

However, most courts have considered the strong and clear language in *Edwards* ("[w]e . . . hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," *id.* at 484-485), as stating a "bright-line" rule. Indeed, the United States Supreme Court recently reaffirmed its commitment to *Edwards*, holding that once a defendant has asserted his right to counsel, the police cannot question him further, unless the defendant initiates the conversation, even if the defendant has been given an opportunity to consult an attorney between invoking the right and the next interrogation. *Minnick* v. *Mississippi, supra.* And even prior to *Minnick*, the Court emphasized that *Edwards* bars questioning of a defendant after he asserts the right to counsel even if the subsequent questioning concerns a different crime. *Arizona* v. *Roberson, supra* at 682-684. In view of the apparent firmness of this precedent, one court recently held that the rule in *Edwards* bars interrogation of a defendant who, five months earlier, asserted his right to counsel in connection with another crime, and had pled guilty to that crime after asserting the right to counsel but before the complained-of interrogation. *United States* v. *Green*, 592 A.2d 985 (D.C. 1991). The court in *Green* considered *Edwards* as stating a clear and unequivocal rule which, at least until further explanation by the United States Supreme Court, should be considered inflexi-

ble even in the circumstances involving the long delay at is-
sue in *Green.*[6]

In view of what has been discussed above, we are prepared
to assume without deciding that the statements made by the
defendant during his interrogation by the police in Lowell
should not have been admitted in evidence because they were
obtained in violation of the rule in *Edwards.* We are satisfied
nonetheless that any error in the admission of the statements
has been shown to be harmless beyond a reasonable doubt.[7]

---

[6]The court in *United States* v. *Green, supra* at 989-990, made the fol-
lowing observations:

"If five months in custody without evidence of police 'badgering' is
held sufficient to dispel *Edwards'* presumption that any new waiver
of rights is involuntary, then why not three months or three weeks?
At what point in time — and in conjunction with what other cir-
cumstances — does it make doctrinal sense to treat the defendant's
invocation of his right to counsel as countermanded without any ini-
tiating activity on his part? . . . Ultimately, given its emphasis on
the need for a bright-line rule in this area, we think only the [United
States] Supreme Court can explain whether the *Edwards* rule is
time-tethered and whether a five-month interval, during which no
efforts at custodial interrogation took place, is too long a period to
justify a continuing irrebuttable presumption that any police-initi-
ated waiver was invalid. Until the Court provides further guidance,
we are persuaded that so long as the defendant remains in custody
the fact that the police did not reinitiate interrogation until five
months after he invoked his right to counsel cannot be adequate rea-
son, alone, or combined with the factors already treated, to justify a
departure from *Edwards'* command."

[7]Federal courts have uniformly held that the use at trial of statements
elicited from a defendant in violation of *Miranda* is subject to a harmless
error analysis. *Bryant* v. *Vose*, 785 F.2d 364, 368 (1st Cir.), cert. denied,
477 U.S. 907 (1986). See *Howard* v. *Pung*, 862 F.2d 1348, 1351-1352
(8th Cir. 1988), cert. denied, 492 U.S. 920 (1989); *United States* v. *John-
son*, 816 F.2d 918, 923 (3d Cir. 1987); *Martin* v. *Wainwright*, 770 F.2d
918, 932 (11th Cir. 1985), modified, 781 F.2d 185 (11th Cir.), cert. de-
nied, 479 U.S. 909 (1986); *United States* v. *Ramirez*, 710 F.2d 535, 542-
543 (9th Cir. 1983); *Harryman* v. *Estelle*, 616 F.2d 870, 876 (5th Cir.)
(en banc), cert. denied, 449 U.S. 860 (1980).

While the United States Supreme Court has not decided a case in which
a harmless error analysis was applied to a Miranda rights violation, it has
recently held that the admission of a coerced confession was subject to the
harmless error doctrine. *Arizona* v. *Fulminante*, 111 S. Ct. 1246, 1263

Currently, the test for harmless constitutional error requires a court to find that the error complained of was "harmless beyond a reasonable doubt." *Chapman* v. *California*, 386 U.S. 18, 24 (1967). The United States Supreme Court has used different formulations of this test. In *Chapman*, the Court stated the proper inquiry to be "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 24, quoting *Fahy* v. *Connecticut*, 375 U.S. 85, 86-87 (1963). In other cases involving constitutional error, the Court phrased the standard in terms of whether overwhelming evidence of the defendant's guilt exists without the erroneously admitted evidence. See *Milton* v. *Wainwright*, 407 U.S. 371, 372-373 (1972).

Under these standards,[8] the assumed *Edwards* error is clearly harmless. The two statements in question contain nothing of importance that was not also contained in the defendant's first, properly admitted, statements from his initial interrogation in Puerto Rico. The defendant merely repeated the same version of his story: that he was present in the hallway, had knocked on the door of Lynn's apartment and asked for the victim, but that someone else had committed the murder. The only new information of relevance contained in the two statements given by the defendant in Lowell was his admission that he had fled from Massachusetts to Puerto Rico after the murder. Because Inspector Durkin properly testified as to the first interrogation in Puerto Rico, the jury heard that the defendant had gone to Puerto Rico separately from his two later statements. Thus, the later statements were merely cumulative of properly admitted evidence.

---

(1991). In view of *Fulminante*, the problem in this case is clearly subject to the harmless error doctrine under Federal law.

[8]The Commonwealth does not appear to dispute the fact that the test for harmless error to be applied in this case is the test for constitutional error and not the less stringent test for nonconstitutional error stated in *Kotteakos* v. *United States*, 328 U.S. 750, 764-765 (1946). We conclude that the stricter test should be applied.

Perhaps the most important factor in determining whether an error is harmless is the over-all strength of the case against the defendant. *United States* v. *Giry*, 818 F.2d 120, 133-134 (1st Cir. 1987). See *Harrington* v. *California*, 395 U.S. 250 (1969) (where evidence of guilt is substantial, an error can more safely be considered harmless). Here, the Commonwealth presented a very strong case against the defendant, independent of all of his statements to the police. Five eyewitnesses placed the defendant at the scene just before and just after the murder. One witness testified that the defendant had stood outside the victim's home on the day of the murder, shouting the victim's name. Another witness answered the door of the apartment where the defendant came looking for the victim, and two witnesses overheard their conversation. Two witnesses saw the victim go into the rear hallway with the defendant, heard the two argue, then heard four shots fired almost immediately. Three witnesses saw the defendant flee the scene just after the murder. Finally, the defendant told one witness of his plan to kill before the murder, and told her of his guilt after the murder. The jury were well warranted in finding the defendant guilty based on the eyewitness testimony and on the defendant's confession to a witness who had no connection with the police.

We conclude that the Commonwealth presented overwhelming evidence of the defendant's guilt independent of the two statements that we assume should not have been admitted in evidence. *Milton* v. *Wainwright*, *supra* at 372-373. We also conclude that there was no reasonable possibility that the statements could have contributed to the defendant's conviction. Contrast *Chapman*, *supra* at 26.

3. *Evidence of telephone conversations.* The defendant argues that the judge improperly admitted the testimony of Wanda Rodriguez concerning two telephone conversations she had with the defendant in which the defendant made incriminating statements. Defense counsel objected at trial on the ground that the Commonwealth had failed to lay a proper foundation to qualify the witness's identification of

the defendant's voice, and so argues here. Specifically, the defendant argues that testimony establishing that Rodriguez was familiar with the defendant's voice in person is insufficient to lay a foundation for her identification of the defendant's voice over the telephone. We conclude that the Commonwealth laid an adequate foundation for Rodriguez's testimony.

A witness is competent to identify a voice over the telephone if the witness is familiar with the caller's voice, identified the voice at the time of the call, and personally heard the conversation. *Chartrand v. Registrar of Motor Vehicles*, 345 Mass. 321, 325 (1963). "Identification of telephone voices by witnesses familiar with the voice of the identified person has long been permitted by the law of the Commonwealth." *Commonwealth v. Lykus*, 367 Mass. 191, 201 n.4 (1975), *S.C.*, 406 Mass. 135 (1989), citing *Commonwealth v. Bonomi*, 335 Mass. 327, 343 (1957), and *Chartrand, supra*. In this case, Rodriguez testified that she had known the defendant for three years prior to the murder, that she and the defendant were friends, that during part of this time the defendant had lived with her aunt, and that she spoke to him nearly every day. Rodriguez knew all of the defendant's nicknames, and knew that he used drugs. Given all of the above facts, we find that the *Chartrand* test was satisfied.[9]

In addition, there were other indicia of the reliability of Rodriguez's testimony. With respect to the first telephone conversation, Rodriguez testified that the defendant asked for her by name, and identified himself as "Junior," one of the nicknames by which she knew him. She also testified that she understood that by "Tullene," the defendant meant Angel Kipp. Finally, Rodriguez testified that the defendant

---

[9]The defendant argues, for the first time on appeal, that the *Chartrand* test should not apply in a criminal case. We have cited *Chartrand* with approval in previous criminal cases, and have never applied different tests to telephone voice identification in civil and criminal cases. *Commonwealth v. Lykus, supra* at 201 n.4. *Commonwealth v. Murphy*, 356 Mass. 604, 611 (1970). *Commonwealth v. Hogan*, 7 Mass. App. Ct. 236, 249-250 (1979).

promised to call her again in a few days. Regarding the second conversation, Rodriguez stated that the defendant again identified himself as "Junior." When Rodriguez asked the defendant how he could have killed the boy friend of Clarissa Otero, who, Rodriguez knew, was a friend of the defendant, the defendant responded that he needed money. Thus, the defendant did not question the mention of Otero. Furthermore, the discussion of money in the second conversation is consistent with Rodriguez's account of the first conversation. Finally, the defendant called a second time, as, according to Rodriguez's testimony, he had promised in his first call. These facts reinforced the reliability of the testimony. Considering these facts, and Rodriguez's considerable familiarity with the defendant's voice, the judge properly allowed the testimony. Any further questions of Rodriguez's credibility or reliability were for the jury.

4. *Review pursuant to G. L. c. 278, § 33E.* The defendant makes no separate argument for any relief pursuant to G. L. c. 278, § 33E. Nevertheless, consistent with our obligation, we have reviewed the record to determine whether the interests of justice require relief. We conclude that the jury verdict should stand because the defendant, by his own admissions, was hired to kill, and did kill, the victim in cold blood. The case, therefore, is one in which premeditated murder was proved by compelling evidence.

*Judgment affirmed.*