**UNITED STATES of America**

v.

**Dennis BROWN**

**No. CRIM.A.03–10116–RGS.**

United States District Court,
D. Massachusetts.

June 25, 2004.

Donald L. Cabell, John T. McNeil, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Michael C. Andrews, Law Offices of Michael C. Andrews, Michael C. Bourbeau, Bourbeau and Bonilla, Joan M. Griffin, Perkins, Smith & Cohen, LLP, Boston, MA, for Dennis W. Brown (1), Defendant.

### FINDINGS OF FACT AND RULINGS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

STEARNS, District Judge.

On June 18, 2002, Dennis Brown was arrested without a warrant while standing on a driveway leading to a home and detached garage at 88 Forest Road in Salisbury, Massachusetts. Incident to the arrest, officers seized a cellular telephone from his person. Police then obtained a search warrant for the garage where a black nylon bag containing a box of nine millimeter ammunition was seized. Brown challenges the existence of probable cause and exigent circumstances justifying a police intrusion on private property to effectuate a warrantless arrest. He also questions the good faith and veracity of an affidavit submitted by Salisbury Police Inspector Richard Simmons in support of the application for the search warrant.

### FINDINGS OF FACT

1. On the evening of June 18, 2002, officers and agents working for the Northeast Merrimack Valley Drug Task Force arranged for a cooperating witness to purchase four illegal firearms from Scott Devlamnick, a convicted felon. The exchange took place in the parking lot of a Dunkin' Donuts in Salisbury, Massachusetts. As the officers converged on Devlamnick, he began shouting "I am not going to jail again for Dennis." Devlamnick immediately identified Dennis Brown as the source of the guns and stated that Brown had offered to pay him half of the $900 sales price for making the delivery. Devlamnick told officers that Brown had retrieved the guns from a blue duffel bag in a garage adjacent to his residence at 88 Forest Street in Salisbury.

2. Dennis Brown was a familiar figure to the officers, having been the subject of a major drug investigation involving a Title I wiretap in the early 1990s. After being indicted, Brown had cooperated with authorities. Both Cpl. David L'Esperance of the West Newbury Police and Lt. Thomas Coffey of the Massachusetts State Police knew Brown from personal debriefings and analysis of hundreds of hours of his intercepted conversations.

3. When Devlamnick stated that Brown expected him to return immediately with the money, Lt. Coffey decided to proceed directly to 88 Forest Street. While en route, Lt. Coffey instructed Devlamnick (who was in custody) to call Brown on his cell phone to explain that the sale was being held up by the buyer's failure to produce all of the promised $900. After two unsuccessful attempts, Devlamnick reached Brown and spoke to him briefly. Brown instructed Devlamnick to proceed with the sale and bring back what he could of the money and collect the balance later. Both Cpl. L'Esperance and Lt. Coffey

overheard the conversation on Devlamnick's cell phone and recognized Brown's voice.

4. Five carloads of officers then converged on 88 Forest Street. The Brown home, which is owned by Dennis's brother, Stephen Brown, is obscured by vegetation and is not visible from the road. A gravel driveway, which provides the only access to the property, leads some 400 feet to the rear of the home, adjacent to which is a detached two story shed used as a garage, a workshop for a motor repair business, and a storage barn. The driveway is not posted or obstructed, although no signs direct visitors to the home or workshop.

5. As the officers reached the end of the driveway, Dennis Brown emerged from the garage, and while speaking on his cell phone, began walking towards Lt. Coffey's lead vehicle. Lt. Coffey ordered Brown to continue walking towards the car keeping his hands in sight. Brown complied and was placed under arrest by Lt. Coffey.

6. Inspector Simmons (who was informed of the arrest), had returned to the Salisbury station to prepare an application for a warrant authorizing the search of the garage for additional firearms. The supporting affidavit in its material essentials related: (a) Brown's prior arrest and conviction for cocaine trafficking; (b) Brown's subsequent cooperation with authorities;[1] (c) the fact that Brown's son, Jason, had been arrested for a drive-by shooting in which one of a dozen firearms Jason had illegally purchased in Georgia had been recovered; (d) that the four guns sold by Devlamnick were among the twelve purchased by Jason; and (e) that seven of the guns had yet to be found. The affidavit also described Devlamnick's arrest, his statements incriminating Brown, and the substance of the telephone conversation overheard by Lt. Coffey and Cpl. L'Esperance in which Brown instructed Devlamnick on how to proceed with the sale. Finally, the affidavit related Devlamnick's statement that Brown had retrieved the guns earlier that day from the shed where they had been hidden in a blue duffel bag.[2] A search warrant for the garage was issued later that evening by a Justice of the Newburyport District Court.

7. The warrant (which authorized a nighttime search) was executed at 11:10 p.m. that night. On the second floor of the garage, officers seized two black nylon bags, one of which bore a tag in the name of Brown's mother, and one of which contained twenty-eight rounds of nine millimeter ammunition.[3]

## DISCUSSION AND RULINGS OF LAW

### The Arrest

■■■ The argument that officers lacked probable cause to arrest Brown "solely on the uncorroborated testimony of Scott Devlamnick" is devoid of merit. "Probable cause" is a far less exacting standard than any test implying a degree of relative certainty, or even a "more likely than not" view of the facts. *See United States v. Melvin,* 596 F.2d 492, 495 (1st

---

1. The affidavit also included inflammatory admissions made by Brown during the earlier drug trafficking investigation under terms of a use immunity agreement entered with the United States Attorney's Office. The government concedes that the inclusion of these admissions in the affidavit was improper and that they may not be considered in evaluating probable cause.

2. Devlamnick was also quoted as saying that on the day before the sale, Brown had shown him a black duffel bag taken from the shed containing "several" handguns.

3. It is not clear from the testimony which of the bags bore the mother's name tag.

Cir.1979). "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." *Commonwealth v. Santaliz*, 413 Mass. 238, 241, 596 N.E.2d 337 (1992). "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In assessing probable cause, a court will be guided by the "collective knowledge" or "fellow officer" rule, under which the aggregate knowledge of all officers involved in the investigation will be imputed to the officer making the arrest. *United States v. Fiasconaro*, 315 F.3d 28, 35–36 (1st Cir.2002).

Here the officers witnessed a serious crime, that is, the sale of firearms by a person known to the officers to be a convicted felon. While Devlamnick was not a "documented" informant, in the sense that he had a proven track record,

his sudden outburst, "I am not going to jail for Dennis again," could be credited as reliable on two grounds—either as a spontaneous utterance, *see Commonwealth v. McLaughlin*, 364 Mass. 211, 221–224, 303 N.E.2d 338 (1973), or as a declaration against penal interest.[4] *See United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir.1996). *See also Lilly v. Virginia*, 527 U.S. 116, 146, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (Rehnquist, C.J., concurring). Police knew that Dennis Brown was a convicted felon with a history of dealing in contraband and that given Jason's incarceration after the shooting incident, he had likely access to the missing firearms. *See United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *United States v. Dauphinee*, 538 F.2d 1, 5 (1st Cir.1976). Finally, it is simply wrong to say that Devlamnick's accusations against Brown were uncorroborated. They were confirmed in the most powerful way imaginable—by Brown himself in the telephone conversation in which he instructed Devlamnick to proceed with the sale.[5]

Brown's second argument with respect to the arrest has more substance. A felony arrest may be made in a public place without a warrant or a showing of

4. *Crawford v. Washington*, —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), is not to the contrary. *Crawford* involved the Sixth Amendment right of confrontation at trial. There is no right to "confront" witnesses upon whom police rely in obtaining probable cause. Moreover, it is doubtful that even in a trial setting *Crawford* would apply to spontaneous utterances or declarations against penal interest. *See Horton v. Allen*, 370 F.3d 75 (1st Cir.2004) (reaffirming the vitality of the "indicia of reliability" and "firmly rooted" tests of nontestimonial hearsay set out in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

5. While defendant objects to the fact that neither Cpl. L'Esperance or Lt. Coffey are trained in voice identification, their prior fa-

miliarity with Brown's voice, gleaned from hours of listening to his telephone conversations and debriefing him in person is more than sufficient to establish the reliability of their recognition of his voice. *See United States v. DiMuro*, 540 F.2d 503, 513 (1st Cir. 1976); *United States v. Degaglia*, 913 F.2d 372, 374 (7th Cir.1990); *Commonwealth v. Perez*, 411 Mass. 249, 262, 581 N.E.2d 1010 (1991). *Ricci v. Urso*, 974 F.2d 5 (1st Cir. 1992), cited by defendant, where the court faulted a voice comparison based on a conversation of less than sixty seconds, is not to the contrary. "[A] voice comparison can provide a perfectly proper basis for establishing a person's identity. We recognize people by voice (including telephone voice), as well as by sight." *Id.* at 7.

exigent circumstances if the arrest is supported by probable cause. *United States v. Watson,* 423 U.S. 411, 423–424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). However, no amount of probable cause will justify the crossing of the "firm line" drawn by the Fourth Amendment at the door of a domicile absent a warrant, voluntary consent, or exigency. *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) (per curiam). *See also Payton v. New York,* 445 U.S. 573, 587–589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).[6] Exigent circumstances exist when there is probable cause to believe that evidence might be destroyed or spirited away during any delay occasioned by the obtaining of a warrant. *Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). Police here had reason to be concerned that any hold-up in Devlamnick's return with the money might cause Brown to suspect that Devlamnick had been arrested and to conceal any weapons that remained in his possession.[7] *See United States v. Cuaron,* 700 F.2d 582, 590 (10th Cir.1983). Nor can it be said that police created their own exigency by failing to obtain a warrant for Brown prior to accosting Devlamnick for the obvious reason that there was no probable cause to do so. Probable cause arose only when Devlamnick implicated Brown. *See United States v. Webster,* 750 F.2d 307, 327–328 (5th Cir.1984).

Equally to the point, Brown was not arrested in his home.[8] The home for Fourth Amendment purposes is defined expansively to include almost any habitable structure, as well as an attached or adjacent garage.[9] *Taylor v. United States,*

**6.** Even in the absence of an exigency, the prevailing view authorizes the warrantless arrest (on probable cause) of a defendant who responds to a noncoercive invitation to leave the shelter of his home, as for example, by responding to a knock at the door or directions from police to step outside. *See United States v. Holland,* 755 F.2d 253, 257 (2d Cir.1985); *Knight v. Jacobson,* 300 F.3d 1272, 1277–1278 & n. 5 (11th Cir.2002). *But see Joyce v. Town of Tewksbury,* 112 F.3d 19, 22 (1st Cir.1997) (there is "no settled answer as to the constitutionality of doorway arrests").

**7.** The inference that Brown was in possession of the seven unaccounted for guns would be stronger had the government established that the four guns sold by Devlamnick had been identified as part of the dozen purchased by Jason before the effectuation of the Brown's arrest. While Inspector Simmons confirmed that fact with ATF prior to completing the affidavit supporting the search warrant, it is not clear whether he acquired this knowledge before Brown was arrested.

**8.** While the government originally challenged Brown's standing to challenge any search of the Forest Road premises, it does not contest Brown's affidavit stating that he had lived on the property for some six months at his brother's invitation and had unrestricted use of the garage (where he maintained a motor repair business). A guest, whether in long-term residence, or simply an overnight visitor, has a legitimate expectation of privacy in at least that part of the premises to which he is granted access by his host. *Minnesota v. Olson,* 495 U.S. 91, 99–100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). *See also United States v. Rhiger,* 315 F.3d 1283, 1287 (10th Cir.2003) (social guest); *United States v. Pollard,* 215 F.3d 643, 647 (6th Cir.2000) (frequent visitor and occasional overnight guest). *Cf. United States v. Oates,* 173 F.3d 651, 656–657 (8th Cir.1999) (defendant had no reasonable further expectation of privacy after refusing to leave the premises at his host's request). Although *Olson* dealt with a *Payton*-type warrantless arrest, its protections apply to warrantless searches as well. *United States v. Osorio,* 949 F.2d 38, 41–42 (2d Cir.1991).

**9.** The government may be correct that there is a reduced expectation of privacy in a garage used for commercial purposes, given the Supreme Court's observation that "[a]n expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). The gov-

286 U.S. 1, 6, 52 S.Ct. 466, 76 L.Ed. 951 (1932); *United States v. Oaxaca*, 233 F.3d 1154, 1157 (9th Cir.2000). The Fourth Amendment expectation of privacy might also in appropriate circumstances attach to a driveway. *United States v. Diehl*, 276 F.3d 32, 39 (1st Cir.2002). A driveway, however, as best I can determine, has never been held by any court to fall under the protections of *Payton*. A driveway, like an open porch, walkway or sidewalk, is impliedly open to the public, of whom police are a part. *State v. Seagull*, 95 Wash.2d 898, 632 P.2d 44, 47 (1981). *See United States v. Roccio*, 981 F.2d 587, 591 (1st Cir.1992); *United States v. Redmon*, 138 F.3d 1109, 1113–1114 (7th Cir.1998) (en banc). Unlike the 500 foot dirt driveway in *Diehl, supra*, which was reached only by proceeding 700 feet down a discontinued road past prominently displayed "No Trespassing" signs, the driveway leading to the Brown residence was graveled, unobstructed, unposted, and as Brown admits in his affidavit, used by customers visiting his garage for motor repairs. While the driveway and garage were not (unlike the driveway and vehicle in *Roccio* ) fully visible from the street, I do not believe that Fourth Amendment protections depend on the length or visibility of a homeowner's driveway, particularly where as here, the driveway offers the only access to the home for visitors, delivery persons, and utility workers. Rather they depend on the homeowner giving objectively reasonable notice to the public, by erecting barriers or gates or by posting

signs, that visitors are not welcome. In sum, I conclude that the arrest, and consequently the search incident to that arrest, were proper.

*The Search Warrant*

While somewhat lacking in focus, the thrust of Brown's challenge to the search warrant is an attack on the credibility of the affiant, Inspector Simmons, and a request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to test his veracity.[10] To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing" that an affidavit contains intentionally false or recklessly untrue statements that are material to a finding of probable cause. *Id.* at 170, 98 S.Ct. 2674. A "substantial" showing " 'lies somewhere between mere denials on the one hand and proof by a preponderance [of the evidence] on the other.' " *Commonwealth v. Ramirez*, 416 Mass. 41, 49–50, 617 N.E.2d 983 (1993), quoting *People v. Lucente*, 116 Ill.2d 133, 107 Ill.Dec. 214, 506 N.E.2d 1269, 1277 (1987). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of wit-

ernment cites several cases so holding with respect to private garages out of which a business is run, although as the government acknowledges, the issue has never been decided by the First Circuit.

**10.** The request for a *Franks* hearing is now moot, as Inspector Simmons testified at the suppression hearing and was fully cross-examined on the contents of his affidavit. I

discuss the *Franks* issue in terms of the showing necessary to trigger a hearing simply to illustrate why it is unnecessary to go behind the "four corners" of the affidavit as *Franks* in exceptional circumstances permits. *Cf. United States v. Southard*, 700 F.2d 1, 7 (1st Cir.1983) (a facially sufficient affidavit is entitled to a presumption of validity).

nesses should be furnished, or their absence satisfactorily explained." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674. A showing of mere negligence or simple factual error in an affidavit is insufficient to trigger a *Franks* hearing. *United States v. Monaco,* 700 F.2d 577, 580 (10th Cir.1983); *United States v. Baldwin,* 691 F.2d 718, 720 n. 1 (5th Cir.1982).

■ If a hearing is warranted, the defendant must prove the knowing falsity or recklessness of the affiant's statements by a preponderance of the evidence. *Franks,* 438 U.S. at 156, 98 S.Ct. 2674. A reckless disregard of the truth is established by showing that the affiant had no reasonable grounds for believing a false statement, or if reasonably doubting its veracity, failed to take readily available steps to ascertain its truth. *Commonwealth v. Nine Hundred and Ninety–Two Dollars,* 383 Mass. 764, 769 n. 7, 422 N.E.2d 767 (1981). The defendant must also show that any deliberately false or reckless statement was material to the determination of probable cause. If such a showing is made, the offending statement is excised from the affidavit, which is then reexamined for probable cause. *Franks,* 438 U.S. at 171–172, 98 S.Ct. 2674; *United States v. Veillette,* 778 F.2d 899, 904 (1st Cir.1985). *See Doescher v. Estelle,* 666 F.2d 285, 288 (5th Cir.1982) (evidentiary hearing properly denied, where even if all challenged material was excised, the affidavit demonstrated probable cause).

In attempting to identify statements in the affidavit that undermine Inspector Simmons' credibility, Brown by personal affidavit first objects to the recitation of incriminating statements that he had made years earlier under an immunity agreement. The objection is not to the truth of the statements, but to the fact of their inclusion in the affidavit, a matter which the government readily concedes was improper even if inadvertently so on Simmons' part. However, excising these statements, which refer to events at least a dozen years old, does nothing to diminish the affidavit's showing of probable cause, based as it is on Devlamnick's and Brown's incriminating statements about the guns.

■ Brown's second objection is to the affidavit's identification of Steven Makos, Jason Brown's intended shooting victim, as "a known cocaine associate" of Dennis Brown, as well as Inspector Simmons' stated "belief" that the shooting had been motivated by an unpaid drug debt.[11] Brown complains that the statement implies that he and Makos were currently (rather than historically) involved in the illegal distribution of cocaine. He also maintains that Salisbury police knew that the dispute over the debt involved money that Brown believed Makos owed him for the use of a trailer home and not drugs. The statement about Brown's (albeit prior) association with Makos in the drug trade is true, as Brown concedes, and as the affidavit (twice) states that Brown had only recently been released on federal parole (sic) after serving a sentence for drug trafficking, was unlikely to cause the magistrate to improperly infer that Brown, who was under federal supervision, was currently distributing drugs. Simmons also knew that Makos had made a number of reported complaints to the Salisbury police about being threatened by Brown over a debt. While most of the reports refer to a debt involving a trailer, the most fulsome, taken by Salisbury Inspector Lattime, quotes

---

11. While Brown objects in passing to any reference in the affidavit to the shooting in which his son was involved, the linkage between the cache of guns illegally purchased (and used) by Jason Brown and the four weapons sold by Brown and Devlamnick is critical to to any finding of probable cause to believe that Dennis Brown was in possession of the remaining seven guns.

Makos as stating that the debt was for "drugs sold in the past." Even assuming that Simmons should have qualified the assertion that the debt involved drugs, the most that can be said is that Simmons was negligent for failing to reference all of the reports, rather than relying solely on the statement taken from Makos by Inspector Lattime. There is certainly no evidence that suggests a knowing falsehood on Simmons' part regarding a point of marginal significance at best.[12]

■ Brown's final argument, that the officers by seizing the ammunition exceeded the scope of the warrant (which was directed solely to firearms) needs no extended discussion. It has long been the law that officers executing a valid warrant are entitled to seize evidence that comes into plain view. *See, e.g., United States v. Aguirre,* 839 F.2d 854, 858–859 (1st Cir. 1988); *United States v. Robles,* 45 F.3d 1, 6 (1st Cir.1995). There is no suggestion that the intensity of the search exceeded the limits authorized by the warrant. *See United States v. Ross,* 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987).

### ORDER

For the foregoing reasons, the motion to suppress is *DENIED.*

SO ORDERED.

---

12. In a supporting Memorandum, Brown also complains about Simmons' statement in the affidavit that he had shown Devlamnick "several" guns prior to the sale, rather than only the four guns actually involved (implying that Brown had additional guns in his possession). Semantics aside, Brown has offered no evidence of the number of guns Devlamnick was actually shown. Finally, Brown maintains that there was no basis for Simmons' statement in the affidavit that the four guns recovered from Devlamnick were among the twelve illegally purchased by Jason Brown. Simmons testified that the information had been supplied to him by ATF while he was preparing the affidavit. Brown has offered no evidence challenging Simmons' testimony as to the source of his information or the accuracy of the statement itself.