# United States Court of Appeals
## For the First Circuit

Nos. 05-2830
     06-1306

UNITED STATES OF AMERICA,

Appellee, Cross-Appellant,

v.

DENNIS W. BROWN,

Defendant-Appellant, Cross-Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Torruella and Howard, Circuit Judges,
and Delgado-Colón,* District Judge.

---

Joan M. Griffin, with whom Benjamin A. Goldberger and McDermott Will & Emery LLP, were on brief, for defendant-appellant/cross-appellee.
Donald L. Cabell, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee/cross-appellant.

---

December 7, 2007

---

*  Of the District of Puerto Rico, sitting by designation.

**TORRUELLA**, **Circuit Judge**. On July 15, 2004, a jury found Dennis W. Brown ("Brown") guilty of being a felon in possession of four firearms and 200 rounds of ammunition in violation of 18 U.S.C. § 922(g)(1). Before trial, the district court had denied Brown's motions to suppress certain evidence and exclude certain testimony. Brown claims error in these denials, and in the manner in which the district court empaneled the jury.

On February 24, 2005, the district court found Brown subject to sentencing under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and handed down a sentence of 180 months' imprisonment. On Brown's motion, the district court resentenced him on July 7, 2005 to take account of the Supreme Court's March 2005 holding in Shepard v. United States, 544 U.S. 13 (2005). The district court found that, in light of Shepard, Brown did not now qualify as an armed career criminal, and handed down a new sentence of sixty-three months. The Government cross-appeals.

After careful consideration, we affirm Brown's conviction. We also affirm his new sentence, but for a reason other than that given by the district court.

## I.  **Background**[1]

On June 18, 2002, Scott DeVlaminck was arrested when he attempted to sell four firearms with ammunition to a cooperating witness.  As police officers converged upon DeVlaminck, he immediately identified Dennis Brown as the source of the guns.  He stated that Brown had offered to pay him half the proceeds of the sale, and that Brown expected him to return immediately with the money.  DeVlaminck told the officers that Brown had retrieved the guns from his garage at 88 Forest Street in Salisbury, Massachusetts.

Lt. Thomas Coffey and Cpl. David L'Esperance had participated in a major drug investigation involving Brown in the early 1990s, and knew him and his voice from personal debriefings and from listening to hundreds of hours of intercepted communications. Coffey instructed DeVlaminck, who had been placed under arrest, to call Brown on DeVlaminck's cell phone and pretend the buyer had demanded a lower price.  As Coffey and L'Esperance huddled close to DeVlaminck and listened in, Brown instructed DeVlaminck to return with as much money as he could get from the buyer.  Shortly thereafter, five police cruisers converged upon the Brown family compound, which contained several buildings including

---

[1]  We recite the facts relating to the denial of Brown's motion to suppress as found by the district court, consistent with record support.  See United States v. Romain, 393 F.3d 63, 66 (1st Cir. 2004); see also United States v. Brown, 322 F. Supp. 2d 101, 103-04 (D. Mass. 2004) (district court's factual findings).

a house owned by Brown's brother, and a garage with a workshop Brown used as a motor-repair business. Brown resided permanently in a trailer near the garage. The complex of buildings was obscured by vegetation and was thus not visible from the road; the only access to it was an unobstructed 400-foot gravel driveway leading to the rear of the home. No signs directed visitors to the home or the motor-repair shop. As the officers reached the complex of buildings, Brown emerged from the garage carrying a cell phone. Coffey placed Brown under arrest and seized the phone. The officers did not have an arrest warrant.[2] There is conflicting and contested evidence that, at some point that evening, Coffey called Brown's cell phone from his own with the number DeVlaminck had provided, and that Brown's cell phone rang.

The Government filed a one-count indictment charging Brown with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Brown claimed that his arrest was illegal, and moved to suppress the cell phone, any information on the cell phone, and any statements made by him at the scene or at booking. The district court held a hearing at which Coffey, L'Esperance, and

_____

[2] Based in part on a description of DeVlaminck's arrest and his statements incriminating Brown, the police were able to obtain a warrant to search Brown's garage, which was executed later that night. The search produced a bag containing twenty-eight rounds of nine-millimeter ammunition. The district court denied Brown's motion to suppress this ammunition. Brown, 322 F. Supp. 2d. at 109. In a special-verdict form, the jury acquitted Brown of possessing this ammunition.

-4-

another officer testified. In their testimony, Coffey and L'Esperance stated that, during the controlled cell phone conversation, they recognized Brown's voice as the one they had heard hundreds of times over the course of the drug investigation involving him in the early 1990s; L'Esperance had also had many face-to-face conversations with Brown. The district court denied the motion to suppress in a written decision, finding that (1) there was probable cause to arrest Brown; (2) the officers did not need a warrant to arrest Brown because he was not in his home or the curtilage thereof; and (3) even if he were in the curtilage, the officers' reasonable fear that he would conceal evidence if DeVlaminck did not return quickly provided exigent circumstances and dispensed with the need for an arrest warrant.

Brown made a number of motions in limine, two of which are at issue in this appeal. In the first motion, Brown sought to exclude the anticipated testimony of Coffey and L'Esperance that they recognized him as the person speaking with DeVlaminck during the controlled cell phone conversation. Brown claimed that evidence of these officers' identification of his voice would be unreliable and unfairly prejudicial, particularly considering that he had, in the interim, undergone cancer surgery resulting in the removal of parts of his tongue. The district court denied the motion. In the second motion in limine, Brown sought to exclude

Coffey's anticipated testimony that he called Brown's cell phone and that it rang.  The district court also denied this motion.

On July 15, 2004, the jury found Brown guilty of possessing the guns and ammunition seized from DeVlaminck.  In the Presentence Report ("PSR"), the probation officer calculated that Brown's Guidelines Sentencing Range ("GSR") was fifty-one to sixty-three months.  The PSR also took into account what the probation officer determined were three prior convictions:  (1) a 1980 conviction for intimidation of a witness, in violation of Mass. Gen. Laws ch. 268, § 13B; (2) a 1982 conviction for assault and battery on a police officer ("ABPO"), in violation of Mass. Gen. Laws ch. 265, § 13D; and (3) a 1992 federal conviction for distributing cocaine.  As a result of these three predicate convictions -- one for a "serious drug offense"[3] and two for "violent felonies," see 18 U.S.C. § 924(e)(1) -- the PSR concluded that Brown qualified as an armed career criminal ("ACC") under the ACCA.  Brown was accordingly subject to a fifteen-year mandatory minimum sentence.  Id.  Brown vigorously challenged his status as an ACC before the district court, arguing on both legal and factual grounds that neither the witness-intimidation conviction nor the ABPO conviction could be considered as ACCA predicates; among

---

[3]  Brown concedes that the 1992 conviction for distributing cocaine qualifies as an ACCA predicate because it is a "serious drug offense."  18 U.S.C. § 924(e)(1) (2000).

Brown's arguments was that the Government had failed to prove the fact of his 1982 ABPO conviction.[4]

On February 24, 2005, the district court adopted the PSR's recommendations and sentenced Brown as an ACC to fifteen years. On March 1, 2005, the Supreme Court handed down Shepard, and on April 1, 2005, Brown moved for resentencing. He argued that, in determining that he committed the violent varieties of witness intimidation and ABPO, the district court had engaged in judicial factfinding of the type now prohibited by Shepard. The district court agreed, quashed Brown's sentence, and ordered that a resentencing hearing be scheduled.

At the ensuing November 10, 2005 resentencing hearing, the parties debated whether Brown could still be considered an ACC, and the focus was on whether Brown's ABPO conviction qualified as an ACCA predicate.[5] The Government argued that Brown could be sentenced as an ACC because, according to United States v. Fernández, 121 F.3d 777, 779 (1st Cir. 1997), Massachusetts ABPO is categorically a violent felony for ACCA purposes, and Shepard had

---

[4] While the Government eventually managed to come up with certified documentation concerning the 1980 witness-intimidation conviction, it was never able to locate any documentation for the ABPO conviction beyond the short entry in the PSR itself. See PSR ¶ 33.

[5] Brown's witness-intimidation conviction was not discussed at the resentencing hearing, and it is not clear why. The district court based its decision not to apply the ACCA on the ground that at least one of the three necessary predicates -- the ABPO conviction -- did not qualify as a violent felony.

not rendered <u>Fernández</u> obsolete.  The district court rejected this argument and held that, since it could not determine whether Brown's crime was violent or nonviolent, it could not count it as an ACCA predicate.  The court consequently sentenced Brown to the original GSR maximum of sixty-three months.

## II.  <u>The Motion to Suppress</u>

Brown appeals the denial of his motion to suppress.  He does not now claim that the police lacked probable cause to arrest him, but maintains that he was in the curtilage of his home and that the police lacked exigent circumstances to arrest him without a warrant.  We affirm the denial of the motion.

### A.  <u>Standard of Review</u>

When considering whether a certain location qualifies as curtilage for Fourth Amendment purposes, we review the district court's findings of fact for clear error and its conclusions of law <u>de novo</u>.  <u>United States</u> v. <u>Diehl</u>, 276 F.3d 32, 37 (1st Cir. 2002). "We will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it."  <u>United States</u> v. <u>St. Pierre</u>, 488 F.3d 76, 79 (1st Cir. 2007) (quoting <u>United States</u> v. <u>Kornegay</u>, 410 F.3d 89, 93 (1st Cir. 2005)) (internal quotation marks omitted).

### B.  <u>Discussion</u>

With one apparent exception discussed below, Brown does not challenge the district court's factual findings with respect to

the motion to suppress, and our examination of the record reveals no error in these findings, much less clear error. We thus turn immediately to whether, in light of these facts along with those adduced at trial,[6] the district court erred in determining that Brown was not in the curtilage of his home.

The Fourth Amendment protects persons from warrantless arrest inside their homes or other places where they have a reasonable expectation of privacy. See Payton v. New York, 445 U.S. 573, 586-87 (1980); United States v. Cruz Jiménez, 894 F.2d 1, 6 (1st Cir. 1990). One such place is the curtilage of the home.

---

[6] We are not restricted to reviewing the record as it stood at the time the district court took its decision on the suppression motion. Relying on Carroll v. United States, 267 U.S. 132, 162 (1925), our sister circuits have taken the view that, if facts presented at trial support the district court's denial of the motion to suppress, the appellate court may consider them. See, e.g., United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 83 (2d Cir. 2002); United States v. Bradford, 78 F.3d 1216, 1222 (7th Cir. 1996); United States v. Han, 74 F.3d 537, 539 (4th Cir. 1996); United States v. Villabona-Garnica, 63 F.3d 1051, 1055 (11th Cir. 1995); United States v. Martin, 982 F.2d 1236, 1241 n.2 (8th Cir. 1993); United States v. Perkins, 994 F.2d 1184, 1188 (6th Cir. 1993); United States v. Corral, 970 F.2d 719, 723 (10th Cir. 1992); United States v. Hicks, 978 F.2d 722, 725 (D.C. Cir. 1992); Virgin Islands v. Williams, 739 F.2d 936, 939 (3d Cir. 1984); United States v. Pearson, 448 F.2d 1207, 1210 (5th Cir. 1971); Rocha v. United States, 387 F.2d 1019, 1020 (9th Cir. 1967). We have acknowledged that this rule "apparently is settled law," United States v. Vargas, 633 F.2d 891, 895 n.6 (1st Cir. 1980). While we take note of arguments against the rule made by academics, see, e.g., 6 Wayne R. LaFave, Search and Seizure § 11.7(d) (4th ed. 2004), and the different practice in some states, see, e.g., Commonwealth v. Grandison, 741 N.E.2d 25, 29-30 (Mass. 2001) (no recourse to trial facts in reviewing decision on motion to suppress), we feel bound to follow it unless and until an en banc panel decides otherwise. See United States v. Baskin, 424 F.3d 1, 4 n.2 (1st Cir. 2005).

Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000). Brown argues that he was standing in the curtilage of his home when he was arrested, and since the police lacked a warrant, the arrest violated the Fourth Amendment.

When determining whether a given location falls within the home's curtilage, we look to whether it is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Diehl, 276 F.3d at 38 (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)) (internal quotation marks omitted). The Supreme Court has identified four specific criteria to guide the analysis:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

Id. at 38 (quoting Dunn, 480 U.S. at 301). We take these factors in turn.

The first Dunn factor would seem to favor a finding that Brown was in the curtilage when arrested: he was arrested at the top of his driveway, adjacent to the garage. The record is unclear on precisely how far this location was from the trailer in which Brown resided. Yet even assuming the two were close together, proximity to the dwelling house is not dispositive. United States v. French, 291 F.3d 945, 952 (7th Cir. 2002). Application of the

-10-

second Dunn factor is unhelpful in the circumstances: there appears to be no evidence on record as to whether there was an enclosure surrounding all or part of Brown's property, or internal enclosures around individual buildings or groups of buildings.

Notwithstanding the fulfillment of the first Dunn factor, an examination of the third and fourth factors leads us to a different conclusion. Although determining whether a given area falls within the curtilage "depends on the facts of a case," Rosencranz v. United States, 356 F.2d 310, 313 (1st Cir. 1966); see also Diehl, 276 F.3d at 39 (rejecting the notion that driveways can never fall within the curtilage), our past cases reveal a number of general principles with respect to driveways. If the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage. See, e.g., United States v. Roccio, 981 F.2d 587, 591 (1st Cir. 1992).[7] This holds true even where the relevant part of the driveway is somewhat removed from a public

---

[7]    Some of our sister circuits appear to have taken different positions on whether a driveway that otherwise meets the curtilage requirements but is exposed to public view is not curtilage, or if it is nonetheless curtilage, albeit curtilage not afforded the same Fourth Amendment protections. Compare, e.g., French, 291 F.3d at 953 (7th Cir. 2002) (driveway in public view not part of curtilage); and United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (open driveway in public view not curtilage despite "No Trespassing" signs); with United States v. Smith, 783 F.2d 648, 651 (6th Cir. 1986) ("The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy."). We endorse the position of the Seventh and Eighth Circuits as the more doctrinally sound.

-11-

road or street, and its viewing by passersby is only occasional. See, e.g., United States v. Hensel, 699 F.2d 18, 32-33 (1st Cir. 1983). Hence, in order for a part of a driveway to be considered within the home's curtilage, public viewing of it must be, at most, very infrequent. The remoteness of the relevant part of the driveway and steps taken by the resident to discourage public entry or observation militate toward a finding that it falls within the curtilage. See Diehl, 276 F.3d at 37, 41 (relevant part of driveway fell within curtilage where it was reached only by proceeding 700 feet along discontinued town road and then 500 feet along the driveway; residents had posted "no trespassing" signs at its entrance, had their mail delivered to a post office box in town, and had instructed United Parcel Service to leave parcels at a store; and members of the public hardly ever entered).

It is clear that the area where Brown was arrested was not visible from the public street, due in part to the 400-foot length of the driveway and vegetation between the street and the relevant area. Nevertheless, the Brown family had erected no barriers, had posted no signs, and had taken no other action to prevent or discourage public entry. Cf. Smith, 783 F.2d at 651-52 (no Fourth Amendment protection for area of driveway near defendant's house, some 225 to 300 feet from public road with no barrier preventing or discouraging entry). Indeed, although there were also no signs directing visitors to the motor-repair business

-12-

located in Brown's garage, Brown admits that he allowed patrons onto the property to drop off and pick up motors.[8]  The Brown property thus contrasts sharply with that in <u>Diehl</u>, where the residents went to extraordinary lengths to fashion "a locus as free from observation by passersby as one could conceive."  <u>Diehl</u>, 276 F.3d at 41.  This, in our view, is the critical distinction between this case and <u>Diehl</u>:  Brown could have no reasonable expectation of privacy in an outdoor area to which members of the public were given ready access.[9]

We conclude that, when Brown was placed under arrest, he was not within an area coming under his home's umbrella of Fourth Amendment protection.  <u>Diehl</u>, 276 F.3d at 38.  As a consequence, the police did not need a warrant to arrest him, <u>see</u> <u>United States</u> v. <u>Martínez-Molina</u>, 64 F.3d 719, 726 (1st Cir. 1995), and we need

[8]  Brown states in an affidavit that customers always phoned ahead before paying him a visit.  This fact does not alter our conclusion.

[9]  Brown argues in the alternative that he should be regarded as having effectively been arrested inside his garage, not in the driveway, because he would not have emerged but for the officers' arrival.  While Brown states in an affidavit that the officers ordered him out of the garage, other evidence, including Coffey's trial testimony, indicates that Brown emerged voluntarily, even before the officers exited their vehicles.  The district court found that he walked out of the garage at the time the officers reached the end of the driveway.  <u>Brown</u>, 322 F. Supp. 2d. at 104. The district court did not commit clear error in reading the evidence in this way.  Accordingly, we need not decide whether the garage fell within the curtilage of Brown's home, or whether Brown could be regarded as having been arrested there had the police ordered or forced him out onto the driveway.

not address Brown's further contention that the district court erred in finding exigent circumstances vitiating the warrant requirement.  We therefore affirm the denial of Brown's motion to suppress.

### III.  The Motions in Limine

Brown made two motions in limine that are at issue in this appeal.  The first concerns Coffey's and L'Esperance's trial testimony that they recognized Brown's voice during the controlled cell phone conversation between Brown and DeVlaminck.  Brown claims these identifications were unreliable and unfairly prejudicial. The second concerns Coffey's trial testimony that he called Brown's cell phone with the number DeVlaminck provided and that it rang. Brown claims the Government's failure to turn over in discovery Coffey's cell phone records from the night in question violated Brady v. Maryland, 373 U.S. 83 (1963).  We address the motions in turn.

### A.  Standard of Review

We review the district court's rulings on whether to admit or exclude evidence, including rulings on motions in limine, for abuse of discretion.  United States v. Guerrier, 428 F.3d 76, 79 (1st Cir. 2005).  The same standard applies to review of the district court's determination that the risk of unfair prejudice does not substantially outweigh the probative value of a given piece of evidence.  United States v. Frabizio, 459 F.3d 80, 90-91

-14-

(1st Cir. 2006); see also United States v. Simon, 842 F.2d 552, 555 (1st Cir. 1988) (district court given "considerable leeway"). "[A]n abuse of discretion occurs when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." Frabizio, 459 F.3d at 91 (citation and internal quotation marks omitted).

### B. **Discussion**

#### 1. **The First Motion in Limine**

Brown argues that evidence of Coffey's and L'Esperance's identification of his voice should not have been placed before the jury because the identification was unreliable. We consider the "totality of the circumstances" to determine whether voice-identification testimony is sufficiently reliable to be allowed into evidence. United States v. Panico, 435 F.3d 47, 49 (1st Cir. 2006); see also Fed. R. Evid. 901. Due process requires the exclusion of such testimony only where there is a "very substantial likelihood of irreparable misidentification." Panico, 435 F.3d at 49 (quoting United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003)).

The district court did not state the reasons for denying Brown's motion in limine, although it remarked on the reliability

-15-

of Coffey's and L'Esperance's voice-identification evidence in its earlier decision on Brown's motion to suppress:

> While defendant objects to the fact that neither Cpl. L'Esperance or Lt. Coffey are trained in voice identification, their prior familiarity with Brown's voice, gleaned from hours of listening to his telephone conversations and debriefing him in person is more than sufficient to establish the reliability of their recognition of his voice.

Brown, 322 F. Supp. 2d at 105 n.5.

We agree with these observations. There is abundant evidence on record that Coffey and L'Esperance had spent a great deal of time listening to Brown's voice. They transcribed "hundreds of hours" of tapes from wiretaps during the drug investigation involving Brown in the early 1990s, and L'Esperance met Brown in person several times after Brown decided to cooperate with that investigation. L'Esperance also testified that he saw and spoke to Brown in a courthouse parking lot a few months prior to the events at issue here. Given the degree of contact between these two officers and Brown, we accord very little weight to the fact that most of it occurred ten or twelve years prior to Brown's arrest. Indeed, L'Esperance testified that listening to Brown's voice during the phone conversation with DeVlaminck was like "listening to a friend," and Brown himself confirmed his apparent acquaintanceship with L'Esperance by uttering in open court, as L'Esperance was being led to the witness stand, "David, my boy, how are we doing?"

-16-

Brown argues that the voice identifications were unreliable because Coffey and L'Esperance had not heard him speak for perhaps ten or twelve years, and his voice had changed "dramatically" in the interim as a result of cancer surgeries on his tongue. As support, Brown submitted to the district court the affidavit of an otolaryngologist stating: "[I]t is likely that Dennis Brown's speech differs today . . . . Specifically his articulation of words would be comparatively diminished." We are unconvinced that Brown's tongue surgeries altered his voice to the dramatic extent he claims.[10] In any event, even if Brown's voice had changed so substantially as to render it unrecognizable, L'Esperance's identification of Brown would probably still be reliable, as the two men had met and spoken in January 2002, after the surgeries. Finally, there is more to voice identification than the degree of articulation of words. L'Esperance stated that he recognized Brown during the phone conversation with DeVlaminck not only because of the sound of his voice, but also because of the distinct manner in which Brown speaks.

---

[10] The otolaryngologist who examined Brown concluded that it was "likely" that his speech had been altered by the surgeries; he had apparently not heard Brown speak prior to the surgeries. According to the otolaryngologist's affidavit, the surgeries were performed by different doctors in 2001 at a different hospital. His somewhat tentative finding that Brown's "articulation of words would be comparatively diminished," based in part on a note in Brown's medical record that he has "some difficulty with speech," does not compel the conclusion that Brown's voice would have been unrecognizable to those who knew him before the surgeries.

Our opinion in Ricci v. Urso, 974 F.2d 5 (1st Cir. 1992), cited by Brown as support for his position, is easily distinguishable. There, police officers suspected Ricci of being a gambler who was under investigation, and whose voice they had recorded from wiretapped conversations. One of the officers called Ricci and taped a conversation with him of less than a minute, and compared the tape with an earlier-made recording of the gambler's voice. The officer concluded the voices were similar, and that Ricci was therefore the gambler. Ricci, 974 F.2d at 6. We found this voice identification unreliable: the officer made the recording on a hand-held recorder, he had no expert training in voice identification, and the entire conversation with Ricci lasted less than sixty seconds. We concluded that "the voice analysis appears no more reliable than the identification of a suspect from a brief visual glimpse." Id. at 7.

As in Ricci, nothing in the record indicates that either Coffey or L'Esperance had special training in voice identification, and DeVlaminck's cell phone records from the night in question show that the conversation with Brown was very brief, perhaps under a minute. Nevertheless, in contrast to the officer in Ricci, Coffey and L'Esperance had extensive experience listening to Brown's voice, and L'Esperance had met with Brown personally and recently. Their familiarity with Brown's voice was much more akin to that of the defendant's ex-husband and friend in United States v. Gilbert,

-18-

181 F.3d 152 (1st Cir. 1999); there, we held identifications made by the ex-husband and friend of the defendant's voice from the audio tape of a phoned-in bomb threat to be sufficiently reliable, despite some suggestive elements in the procedure. See id. at 163. Coffey also testified that he had put the volume of the cell phone on the loudest setting, so that the person on the other end would be audible even without placing one's ear to the receiver; according to Coffey, "[W]e could all hear it as clear as day."

While we acknowledge that the conditions here -- with three men huddled together listening to the same cell phone -- were not the best for making a voice identification, the defects were not so grave as to render the district court's ruling on reliability an abuse of discretion. The totality of the circumstances make it quite plausible that Coffey and L'Esperance could hear Brown clearly, and could recognize and remember his voice upon hearing him.

Brown also claims that the district court abused its discretion in failing to grant the first motion in limine under Federal Rule of Evidence 403: if Coffey and L'Esperance were to testify as to why they were familiar with Brown's voice, they would have to discuss how Brown was the subject of an extensive investigation by a drug taskforce, and such testimony would leave the jurors with the unfair impression that he was a career criminal. According to Brown, this danger substantially outweighed

any probative value the officers' voice-identification testimony may have had. See Fed. R. Evid. 403.

In our view, Coffey's and L'Esperance's identifications of Brown's voice in the cell phone conversation had considerable probative value to an issue directly in dispute: whether Brown was the man on the other end of the line, instructing DeVlaminck to sell the guns and return with the money, tends to show that Brown was the owner of the guns, or at least had a significant stake in their sale. On the other side of the equation, any risk of unfair prejudice resulting from testimony on Brown's criminal past was greatly attenuated by the cautious way in which the parties fashioned their arguments and elicited testimony at trial. While both parties' closing arguments referred to the wiretap investigation, neither stated the purpose of the investigation or even that it involved suspected criminal activity. Similarly, Coffey testified that Brown had been the subject of a wiretap investigation, but did not reveal its purpose or any details of it, or that Brown was suspected of committing a crime. L'Esperance likewise testified that Brown had been wiretapped and recorded as part of a "law enforcement initiative."

Brown stipulated at trial that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year. The district court informed the jury of this stipulation, and cautioned the jurors not to speculate on the

-20-

nature of the crime of which Brown had been convicted. While the wiretap testimony may have led some jurors to speculate as to why Brown was investigated in the early 1990s, it is difficult to imagine any significant danger of unfair prejudice accruing to Brown that would outweigh the probative value of the testimony. Any such juror probably simply assumed the investigation related to the crime Brown had stipulated to committing. It is highly unlikely that any juror based all or a substantial portion of his or her decision regarding Brown's guilt on the fact that he had been the subject of a wiretap investigation. See United States v. Flemmi, 402 F.3d 79, 86 n.8 (1st Cir. 2005) ("Evidence is unfairly prejudicial if it invites the jury to render a verdict on an improper emotional basis." (quoting United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000)) (internal quotation marks omitted)). In any event, we need not strike the Rule 403 balance ourselves, but need merely determine whether the district court abused its discretion in striking the balance. It is clear that there was no abuse of discretion here. See United States v. Charles, 456 F.3d 249, 257 (1st Cir. 2006) (reversal of district court's Rule 403 judgment called for "only rarely" and "in extraordinarily compelling circumstances" (quoting Flemmi, 402 F.3d at 86) (internal quotation marks omitted)).

We accordingly conclude that the district court did not abuse its discretion in denying Brown's motion in limine to exclude the voice-identification testimony of Coffey and L'Esperance.

## 2. **The Second Motion in Limine**[11]

At the motion to suppress hearing, Coffey testified that he confiscated Brown's phone when Brown was arrested, called it from his own phone using the number DeVlaminck had provided, and that it rang. On cross-examination, Brown confronted Coffey with Brown's phone records from that evening, which show one call at 7:29 p.m. and the next at 8:40 p.m. Coffey testified that he must have called at 8:40 p.m., while still at the Brown property. Brown then showed Coffey a booking sheet indicating that Brown had been booked at 8:15 p.m., and that a cell phone had been inventoried as one of Brown's possessions. Coffey responded that this entry did not necessarily mean that Brown's phone was seized at 8:15 p.m.

Three days later, Brown's counsel sent a letter to the Assistant U.S. Attorney asking to be provided with "records of Coffey's cell phone showing the telephone call to Dennis Brown's cell phone." The Government did not provide such records. Brown

---

[11] Brown argues that Coffey's phone records were Brady material the Government failed to hand over. The Government urges us to review this argument for plain error, as Brown did not raise it below. See United States v. Hansen, 434 F.3d 92, 104 (1st Cir. 2006). Because we conclude that there was no error at all in the district court's refusal to exclude Coffey's testimony on the confirmatory phone call, we need not decide whether Brown's claim is subject to review for plain error, instead of abuse of discretion.

then filed the motion in limine, claiming that any testimony on Coffey's confirmatory phone call should be excluded on the ground that it is "contradicted by affirmative undisputed evidence in the record," including Brown's cell phone records, the booking sheet, and police records that show Coffey was at the Salisbury police station interrogating DeVlaminck between 8:15 p.m. and 9:25 p.m. Brown also asserted that the testimony should be barred because the Government failed to hand over Coffey's phone records in spite of Brown's request.

At trial, prior to Coffey's testimony, Brown reminded the district court of the still-pending motion in limine, emphasizing that it should be granted because the Government had failed to hand over Coffey's phone records. The Government responded that it did not have the records. The district court issued a brief oral ruling disposing of the motion: "The records were equally accessible to both sides. [Brown] could have issued a subpoena for them. So the motion is denied."

Testimony at trial on this issue was predictably confused. An officer who was present at Brown's arrest testified that Coffey dialed Brown's number immediately after confiscating the phone and that it rang. Coffey testified on direct examination that he called the phone and it rang, but that he did not remember whether he called while still at Brown's property or sometime later. On cross-examination, Coffey testified that, despite what

was reflected in the 8:15 p.m. booking entry, "we were still looking at [Brown's] personal property," that the phone was sent to another police station, and that "the Salisbury Police did not have physical possession of that phone at 8:15." When shown evidence that he was at the Salisbury police station interrogating DeVlaminck between 8:15 p.m. and 9:25 p.m., Coffey acknowledged that he was not still at the Brown property at 8:40 p.m., when Brown's phone records show an incoming call.

Brown now appeals the district court's denial of his motion in limine. He argues that Coffey's phone records were Brady material because they would have directly contradicted Coffey's testimony on a key issue: the fact that Coffey called the number DeVlaminck provided and Brown's phone rang bolstered the Government's claim that it was Brown with whom DeVlaminck had been speaking during the earlier controlled phone conversation. Evidence that no phone call was made would also tend to discredit Coffey in general.

The Supreme Court's holding in Brady requires the Government to disclose exculpatory evidence in its possession that is "material either to guilt or to punishment." Brady, 373 U.S. at 87. Information is "material" if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Caro-Muñiz, 406 F.3d 22, 29 (1st Cir. 2005) (quoting

-24-

United States v. Rosario-Peralta, 175 F.3d 48, 53 (1st Cir. 1999)). To vacate a conviction because of a Brady violation, the defendant must make a three-part showing: "[1] the evidence at issue [was] favorable to [him], either because it is exculpatory, or because it is impeaching; [2] that evidence [was] suppressed by the [s]tate, either willfully or inadvertently; and [3] prejudice . . . ensued." United States v. Josleyn, 206 F.3d 144, 153 (1st Cir. 2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

The Government maintains that Coffey's phone records are not, and never have been, in its custody or control, and that it therefore has no obligation to seek them out and disclose them. See United States v. Bender, 304 F.3d 161, 163 (1st Cir. 2002). Yet even assuming for the sake of argument that Coffey's phone records were in the actual or constructive possession of the Government, and that they would indicate that Coffey made no call to Brown's phone on the evening in question, Brown has still failed to satisfy the third element of the Strickler test -- that is, that prejudice ensued. See United States v. Nelson-Rodríguez, 319 F.3d 12, 35 (1st Cir. 2003) (Brady does not "provide[] grounds for relief unless the exclusion or failure to produce prejudiced [the] defense."). The jurors heard Coffey's testimony and that of the other officer, had the booking sheet and Brown's phone records before them, and still decided the evidence established beyond a reasonable doubt that Brown possessed the guns recovered from

-25-

DeVlaminck. They obviously believed Coffey notwithstanding the implausibilities in the relevant portions of his testimony, or disbelieved him but believed the considerable quantum of other evidence -- such as DeVlaminck's and L'Esperance's testimony -- linking Brown to the guns. It is highly unlikely that the verdict would have been any different had Coffey's phone records been in evidence, no matter what they may have indicated, or that the records or Coffey's testimony in response to them would have "put the whole case in such a different light as to undermine confidence in the verdict." United States v. Casas, 356 F.3d 104, 114 (1st Cir. 2004); see also United States v. Dumas, 207 F.3d 11, 16 (1st Cir. 2000) ("Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral." (quoting United States v. Shelton, 588 F.2d 1242, 1248 (9th Cir. 1978))). The failure to provide the purported Brady material did not prejudice Brown, and the district court's refusal to exclude Coffey's testimony on the confirmatory phone call was accordingly not error.

## IV. The Allocation of Peremptory Challenges

Brown next argues that his conviction should be reversed or retrial granted because the district court, in its manner of

selecting alternate jurors, violated Federal Rule of Criminal Procedure 24 and diluted the proportion of peremptory challenges to which he was entitled vis-à-vis the Government.[12]

### A.  Standard of Review

The Government argues for plain error review because Brown failed to make a timely objection to the district court's method of selecting alternate jurors. We agree. See United States v. McFarlane, 491 F.3d 53, 60 (1st Cir. 2007). Under the plain error standard, Brown must prove "(1) an error, (2) that is plain, and (3) that affects substantial rights," and that the error "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Connolly, 341 F.3d 16, 31 (1st Cir. 2003) (citations and internal quotation marks omitted).

### B.  Discussion

The district court seated fourteen jurors using the "struck" method. During jury empanelment, the court gave Brown eleven peremptory challenges: the ten from Rule 24(b)(2) plus the

---

[12] Rule 24 establishes the method of selecting jurors and alternate jurors, and specifies the number of peremptory challenges available to each party. In a non-capital felony case such as this one, Rule 24(b) guarantees the defendant ten peremptory challenges and the Government six. Fed. R. Crim. P. 24(b)(2). Rule 24(c) allows the district court to empanel alternate jurors. Fed. R. Crim. P. 24(c)(2)(B). When the court empanels two alternates, each party is entitled to one additional peremptory challenge, and this challenge "may be used only to remove alternate jurors." Fed. R. Crim. P. 24(c)(4)(A).

one from Rule 24(c)(4). It gave the Government seven: the six from Rule 24(b)(2) plus the one from Rule 24(c)(4). At the close of trial, before sending the jury to deliberate, the district court drew the names of two of the fourteen jurors by lot and designated them as the alternates.

Brown claims that this method of empaneling alternate jurors and allocating peremptory challenges violated Rule 24. He is correct. The mandate in Rule 24(c)(4) that "additional challenges may be used only to remove alternate jurors" implies that these alternates must be designated at voir dire, when the parties still have the opportunity to use peremptory challenges to remove potential jurors, and not by lottery at the end of trial. This conclusion comports with that reached by other circuits. See, e.g., United States v. Brewer, 199 F.3d 1283, 1287 (11th Cir. 2000); United States v. Love, 134 F.3d 595, 601 (4th Cir. 1998).

Brown then mounts an imaginative but ultimately unavailing argument as to how he was harmed by this violation. Had the district court followed Rule 24, Brown would have had ten peremptory challenges to use against the pool of persons from which the twelve regular jurors were be drawn, while the Government would have had only six; in other words, Brown would have had 167 percent of the Government's challenges. By lumping each party's extra peremptory challenge for the two alternates together with the original challenges, the district court gave Brown eleven

-28-

challenges and the Government seven; Brown thus had only 157 percent of the Government's challenges to use against a pool of persons from which twelve regular jurors and two alternates would be drawn. Brown contends that his loss of advantage over the Government was significant because the trial was very short, and it was unlikely that any alternate would end up stepping in for a regular juror; indeed, as it turned out, the alternates were not used. Although he concedes that he can point to no concrete prejudice, he argues that prejudice should be presumed because the variation may have "reverberate[d] throughout the process of challenging jurors and result[ed] in a dramatically different panel deciding [his] case."

Brown greatly exaggerates the consequences of the district court's error, and the remedy he asks for -- reversal or retrial -- is far out of proportion to the harm he claims he suffered. We addressed this very question more than twenty-five years ago under an earlier version of Rule 24. In United States v. Flaherty, 668 F.2d 566, 601 (1st Cir. 1981), the district court empaneled two alternates, and each defendant was thus entitled to one additional peremptory challenge in addition to the original ten. Disregarding the rule's express mandate that "[t]he additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed . . . may not be used against an alternate juror," the district court

combined the original and additional peremptory challenges together to be used against a pool containing both regular jurors and alternates. We held as follows:

> Despite the clear transgression of the rule, we do not perceive how defendants' exercise of their peremptory challenges was curtailed in any way. . . . We do not think that combining the regular and alternate challenges amounts to a violation of defendants' substantial rights. . . . This, however, does not put our imprimatur on the court's procedure for the exercise of peremptory challenges.

Id. While Rule 24 has since been amended, its substance remains the same with respect to the prohibition on combining regular and alternate challenges in this manner. As in Flaherty, while we regret the district court's failure to follow the rule, we cannot imagine how Brown's substantial rights could possibly have been prejudiced.[13] There was no prejudice here and certainly no plain error.

Having concluded that Brown's conviction stands, we turn now to the sentence imposed by the district court.

## V. The Sentence

The Government appeals the district court's sentence of sixty-three months. It argues that both ABPO and witness intimidation in Massachusetts law are categorically violent

---

[13] Although the record of the jury empanelment proceeding is not entirely clear, it appears to show that thirteen jurors were dismissed based on peremptory challenges exercised by the parties. The record does not reveal how many of the thirteen peremptory challenges were used by each party.

felonies for purposes of the ACCA, and that the district court erred in not sentencing Brown as an ACC.

### A. Standard of Review

We review de novo whether a prior conviction qualifies as a violent felony for purposes of the ACCA. United States v. Pratt, 496 F.3d 124, 130 (1st Cir. 2007); see also United States v. Santos, 363 F.3d 19, 22 (1st Cir. 2004) (same standard for U.S.S.G. § 4B1.1).

### B. Discussion

Recently, in United States v. Holloway, 499 F.3d 114 (1st Cir. 2007), we addressed nearly the same question as the one at issue in Brown's resentencing hearing, and adopted a position substantially in line with that of the Government: notwithstanding Shepard, assault and battery under Massachusetts law is still categorically a violent felony for ACCA purposes. See id. at 118. This holding strongly suggests what, in other circumstances, may have been the outcome in this case. In light of what we say below, however, we do not reach this question, nor need we address whether Massachusetts witness intimidation is categorically a violent felony.

The record suffers from an infirmity that renders us unable to hold the ACCA applicable. As Brown points out, the evidence concerning his ABPO conviction is extraordinarily sparse. The relevant paragraph of the PSR lists the following pieces of

-31-

information: that Brown was charged with the offense of ABPO in Newburyport District Court; that the date of Brown's arraignment was August 2, 1982; that Brown was represented by counsel; and that the matter was disposed of on June 13, 1983. Next to this date, "G. $625 fine" appears. See PSR ¶ 33. Where a description of the facts would normally appear, the PSR states that "[n]o information was available regarding this offense." Id. Brown concedes that he was charged with this offense, but contends that, on his recollection, there was no guilty finding, and the case was dismissed upon payment of the $625 fine. The Government has not produced -- and has apparently been unable to locate -- any documentation or other evidence relating to this offense, apart from the PSR entry.

Brown contests the accuracy of the PSR entry in question, and has consistently maintained, both in the district court and before us, that the Government failed to satisfy its burden of proving the fact of the Massachusetts ABPO conviction. We reject the Government's contention that Brown somehow conceded his ABPO conviction by arguing at various points that it did not qualify as an ACCA predicate because the underlying circumstances were nonviolent. We read these merely as arguments in the alternative, in case the district court found over Brown's objection that the three proffered predicates in fact existed. Brown's objection to the existence of the ABPO conviction was spelled out in a

sentencing memorandum to the district court dated January 5, 2005, and the point was debated at some length during the February 24, 2005 sentencing hearing. At that hearing, the district court acknowledged that "[t]he awkward aspect of this case is that all the records have been lost, as best as anyone can tell." It nonetheless held it was "satisfied with the accuracy of the records that have been presented . . . confirming the three prior convictions," and sentenced Brown to the fifteen-year ACCA minimum.[14]

This determination was in error. The Government's burden of proving a predicate conviction for sentencing purposes is admittedly a "modest" one that can be satisfied "in divers ways," including by introducing a certified copy of the judgment, or by a statement in the PSR. United States v. Cordero, 42 F.3d 697, 701 (1st Cir. 1994); accord United States v. Barbour, 393 F.3d 82, 93 (1st Cir. 2004). However, when a defendant challenges a conviction laid out in the PSR, more is required. This case provides ample

_____

[14] When Brown contended at the hearing that the burden was on the government to prove the fact of the ABPO conviction, the district court held, in reliance on Parke v. Raley, 506 U.S. 20 (1992), that the burden of production was on the defendant. Yet Parke is unavailing to the Government in these circumstances. The statute at issue in Parke required, as does the ACCA, that the prosecution prove the fact of a final judgment. Id. at 23-24. Once the prosecution has done so, the Supreme Court held, a "presumption of regularity" attaches to the judgment that the defendant bears a heavy burden of rebutting. Id. The Government in this case has not managed to get past the hurdle of proving the final judgment's existence.

-33-

reason why.  Brown was sentenced to five years and three months in prison.  He was arrested and taken into custody on June 18, 2002, and has presumably served all or most of his five years and three months by now.  The mandatory minimum under the ACCA is fifteen years.  18 U.S.C. § 924(e)(1).  The Government would have us keep Brown in prison for ten more years based on nothing more than the letter "G" in paragraph 33 of the PSR.  Indeed, as the PSR itself states, "No information was available regarding this offense."  PSR ¶ 33.  In the face of this reality, the Government cannot be said to have met even its modest initial burden when it can produce nothing more.  This was also the conclusion of the District of Columbia Circuit:

> [T]he Government may not simply rely on assertions in a presentence report if those assertions are contested by the defendant. Thus, when the defendant calls into dispute a presentence report's description of an alleged prior conviction, the Government must demonstrate that the description in the report is based on a sufficiently reliable source to establish the accuracy of that description.

United States v. Price, 409 F.3d 436, 444 (D.C. Cir. 2005); cf. United States v. Dueño, 171 F.3d 3, 7 (1st Cir. 1999) (contested PSR entry, where none of the evidence supporting the entry appeared in the record, insufficient on its own to prove existence of guilty plea for purposes of Guidelines enhancement).[15]

---

[15]  Other cases that treat the sufficiency of a presentence report for this purpose refer to "uncontroverted" reports.  See Cordero, 42 F.3d at 701; see also United States v. Romero-Rendón, 220 F.3d

-34-

Accordingly, we hold that the ACCA is inapplicable in the circumstances because the Government has proven, at most, just two prior convictions that qualify as predicates under 18 U.S.C. § 924(e). We consequently arrive at the same conclusion reached by the district court when it resentenced Brown, albeit for a different reason, and see no need to disturb the court's sentence of sixty-three months. See Bristol Energy Corp. v. N.H. Pub. Utils. Comm'n, 13 F.3d 471, 478 (1st Cir. 1994) (Court of Appeals may affirm on any theory supported by the record). Since we hold the ACCA inapplicable, we need not address Brown's various challenges to its constitutionality.

## VI. Conclusion

Brown's conviction is **affirmed**. Brown's sentence is **affirmed**, but on different grounds.

---

1159, 1164-65 (9th Cir. 2000) (no error for district court to rely on PSR entry as evidence of conviction for ACCA enhancement where defendant had not challenges entry's accuracy); United States v. Hudspeth, 42 F.3d 1015, 1019 n.6 (7th Cir. 1994) (en banc) ("[A] presentence investigation report, if not challenged, will normally satisfy this showing."); cf. United States v. Serrano-Beauvaix, 400 F.3d 50, 54-55 (1st Cir. 2005) (no error for district court to rely on uncontroverted PSR entry as proof of conviction for purposes of calculating Guidelines criminal history score).