## COMMONWEALTH vs. GREGORY DAGRACA.

Middlesex. September 7, 2006. - October 17, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Controlled Substances. Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions, Cumulative evidence. *Error, Harmless.*

At a criminal trial it was error to admit in evidence certain statements made by the defendant to a police officer, where the police officer, in advising the defendant of his rights, had failed to inform him that any statement the defendant made could be used against him [551-552]; further, considering that the Commonwealth's evidence other than the erroneously admitted statements was entirely circumstantial and that the defendant mounted a plausible, corroborated defense to that evidence, it could not be said that the error in admitting the evidence was harmless beyond a reasonable doubt [552-557].

INDICTMENTS found and returned in the Superior Court Department on June 20, 2002.

A pretrial motion to suppress evidence was heard by *Thomas P. Billings*, J., and the cases were tried before *Judith Fabricant*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*David Keighley* for the defendant.

*Miriam S. Pappas*, Assistant District Attorney (*Loretta Smith*, Assistant District Attorney, with her) for the Commonwealth.

MARSHALL, C.J. The defendant, Gregory Dagraca, was indicted for trafficking in cocaine over one hundred grams, possessing marijuana with intent to distribute, and committing each offense in a school zone. He moved to suppress statements he had made to the police, claiming that he had not been given a complete set of Miranda warnings.[1] See *Miranda* v. *Arizona*, 384 U.S.

---

[1]The defendant also moved unsuccessfully to suppress physical evidence

436, 444, 479 (1966). A judge in the Superior Court denied the motion, and the Commonwealth introduced the statements in evidence at trial. The jury convicted the defendant of the lesser included offenses of trafficking in cocaine over fourteen grams and possessing marijuana; the school zone charges were nolle prossed.[2]

In an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed the convictions. See *Commonwealth* v. *Dagraca*, 65 Mass. App. Ct. 1109 (2005). The court concluded that the Miranda warnings given to the defendant were incomplete and that accordingly his statements should not have been admitted in evidence. It further concluded that the error was harmless beyond a reasonable doubt "in view of the other overwhelming evidence of the defendant's guilt presented to the jury." We granted the defendant's application for further appellate review. We agree with the Appeals Court that, because the police failed to give the defendant all of the Miranda warnings, his statements to the police should not have been admitted. We conclude, however, that the error was not harmless beyond a reasonable doubt. We therefore reverse the defendant's convictions.

1. *Background.* (a) *Commonwealth's case at trial.* In connection with a narcotics investigation conducted in April, 2002, Detective Linda Coughlin of the Lowell police department surveilled a house at 50 Hawthorne Street, in Lowell. Of the approximately six times that she surveilled the house, she saw the defendant come and go about three or four times. Thereafter, Detective Coghlin applied for and obtained a warrant to search the property.

On April 28, 2002, the day the warrant was executed, Detective Coughlin; her supervisor, Sergeant James Trudel; and several other officers conducted a "pre-raid surveillance" of the house. Sergeant Trudel observed two people leave the house in a vehicle, which Detective Coughlin then followed for a short

---

seized from his person at the time of his arrest. He does not challenge that ruling on appeal.

[2]The defendant was sentenced to from three to five years on the cocaine trafficking charge, and to probation for three years on the marijuana possession charge, to be served from and after the period of incarceration.

time. Sergeant Trudel then drove past the house a couple of times in an unmarked car, the second time noticing the defendant standing on the front porch. From the porch, the defendant called out, "Why are you following my friends?" Sergeant Trudel, dressed in plain clothes, got out of his car and, while walking toward the house, displayed a police badge and said, "Lowell Police. I'd like to talk to you for a minute." Once Sergeant Trudel reached the porch, the defendant began pushing and wrestling with him, trying to get to the door. As the two were struggling, Detective Coughlin returned with another officer who assisted Sergeant Trudel in handcuffing the defendant.

On the porch, the officers pat frisked the defendant, discovering marijuana and $11,000 in cash in a pocket.[3] In the defendant's wallet was $466 in cash and a piece of paper listing fifty-nine names and corresponding numbers, which Detective Coughlin characterized as consistent with a drug ledger. Also in his wallet were receipts from Foxwoods Casino in Connecticut showing that the defendant had won a total of $12,000 within the previous two weeks.[4]

After informing the defendant that they had a warrant to search the premises, the officers escorted him into the house and seated him in the living room. Sergeant Trudel testified that he informed the defendant of the Miranda warnings. Detective Coughlin then asked who lived in the house, to which the defendant replied that he did, but that someone else owned it. Sergeant Trudel also testified that the defendant said "he was staying there, but he didn't own the house."

Approximately seventy-five to eighty per cent of the house was under renovation: although there was some furniture in the living room, the floors were "down to the studs"; the first-floor bathroom, while it contained a basin and toilet, was "totally gutted out"; the plaster in the hallways going up to the second floor had been removed; and of the three bedrooms on the second floor, two were gutted and one was intact. Sergeant Trudel testified that the defendant told him that he had participated in the renovation.

---

[3]The Commonwealth introduced no evidence regarding the amount of marijuana found in the defendant's pocket.

[4]The defendant introduced in evidence his tax returns for 2002, showing that he reported a total of $17,500 in gambling winnings.

The kitchen, while not completely finished, had new cabinets, appliances, and flooring; a refrigerator; a sink; a kitchen table and a second table; and an island. Detective Coughlin found on the kitchen table a bag containing 15.34 grams of cocaine. Inside an open drawer of the second table, Detective Coughlin discovered four bags of cocaine. He opined that each bag was packaged for sale as a twenty- or forty-dollar bag; only one bag was tested for drugs and was found to contain .44 grams of cocaine. From the same drawer, Detective Coughlin recovered a bag containing marijuana and a digital scale; she suggested that the scale could be used to weigh cocaine and heroin.[5] In the kitchen Detective Coughlin also found other items that she testified were commonly used in packaging drugs: a small metal cup, a spoon with a wooden handle, and plastic bags with the corners cut off.

The one bedroom on the second floor that was not gutted contained a bed, a desk, papers, photographs of the defendant on the wall, and men's clothes and shoes in the closet. In the closet the police found a jacket, whose pockets held bags containing marijuana and 94.18 grams of cocaine.[6] The Commonwealth presented no evidence regarding the sizes of the clothes or shoes. The police also testified that they found in the closet a contrivance commonly used to conceal drugs — a can with a false bottom — which contained six "beat bags," i.e., fake narcotics designed to "beat the individual[s] out of the money and they don't get the real drug." In the same bedroom, the police found Inositol, a compound used to cut cocaine; small plastic bags used for packaging marijuana or cocaine; and sixty dollars in cash. They also found an address book labeled "Address book for Gregory."

The police discovered some of the defendant's mail at the house, but it was addressed to the defendant at an address in Medford. A cellular telephone and pager were also recovered, but while Detective Coughlin testified that such items can be used to facilitate narcotic sales, the items were not specifically

---

[5]The Commonwealth introduced no evidence regarding the amount of marijuana found in the drawer.

[6]The Commonwealth introduced no evidence regarding the amount of marijuana found in the jacket.

linked to the defendant. Finally, the police seized from the house a lease agreement dated April 15, 2002, through which the defendant had agreed to rent the house from Joseph F. Ignatowicz for one year, to commence on April 15, 2002.

(b) *The defendant's case.* The defendant's case, presented through his own testimony and that of Ignatowicz and the defendant's girl friend, consisted of the following facts. Ignatowicz, who owned the house as an investment but did not live there, engaged a few of his friends to renovate the house before and during April of 2002; the defendant denied participating in the renovation. The kitchen included an old refrigerator but no working stove (the workers kept lunches in the refrigerator); the bathroom, while gutted, had a toilet and working shower; and the furniture in the living room belonged to Ignatowicz. Ignatowicz kept a key under the doormat for people who were working on the house to gain access to it.

The defendant had agreed with Ignatowicz to move in when the renovations were completed, ideally May 1, but the renovations were taking longer than expected. Thus, while the defendant had visited the house on a few occasions to review aspects of the renovations with Ignatowicz, and had delivered some of his belongings to the house — he had left on the first floor of the house two large boxes and a bag, all of which were "wrapped up" — he had not yet moved in. In April of 2002, the defendant was living with his girl friend in Medford — the address on the mail found in the Lowell house was the Medford address where the defendant's girl friend lived. Ignatowicz testified that he gave notice to tenants living in the house before April 28 "that they had to move because I intended on renovating the rest of the place and I had another tenant moving in." According to Ignatowicz and the defendant, they executed a lease to commence on April 15 because Ignatowicz had become delinquent on some of his utility bills, and so in order to maintain utility service, they executed the lease so as to put the utilities in the defendant's name.

On April 28, the defendant's girl friend dropped the defendant off at the house to pick up his car, which he had left for the workers to use, and to see what progress was being made on the house. The defendant's account of his altercation with the offic-

ers at the house was that, when Sergeant Trudel drove up, the defendant did not know who he was; Sergeant Trudel quickly got out of his car and approached the defendant; the defendant, who was standing near the sidewalk, began walking toward the house to get away from Sergeant Trudel; and Sergeant Trudel grabbed him before identifying himself as a police officer. The defendant denied having attempted to enter the house when Sergeant Trudel approached him.

The defendant was carrying $11,000 because he was planning to purchase a motorcycle that day. In April, 2002, the defendant, who was sometimes employed as an electrical subcontractor, won $12,000 playing slot machines at Foxwoods Casino. As for the piece of paper in his wallet listing fifty-nine names and corresponding numbers, the defendant explained that the list referred to participants and scores in a "fantasy baseball" game.

The defendant claimed that, once escorted into the house, he was not given his Miranda rights before the police began questioning him about whether he lived there. In addition, he denied having been in the house on April 28 before the police arrived; having kept clothes or other items in the second-floor bedroom; having slept over at the house; having owned the cellular telephone or pager recovered from the house; and having had any knowledge of the drugs found in the house. The defendant disclaimed ownership of the jacket recovered from the second-floor bedroom closet — at trial he tried on the jacket, showing that it was too big for him.

2. *Discussion.* (a) *Miranda warnings.* Before trial, the defendant moved to suppress the statements he had made to Sergeant Trudel and Detective Coughlin, claiming that he had not received all of the Miranda warnings. At the motion hearing, Sergeant Trudel testified that when he informed the defendant of his Miranda rights he had not read from a Miranda card, but had recited the warnings from memory.[7] At the hearing, he again recited the warnings from memory, testifying that he had advised the defendant "[t]hat he had the right to remain silent, that he had the right to have an attorney, to have an at-

---

[7] For discussions of the value of the use of Miranda cards by police officers, see *Commonwealth* v. *Lewis,* 374 Mass. 203, 204-205 (1978); *Commonwealth* v. *Ayala,* 29 Mass. App. Ct. 592, 596 (1990).

torney with him during questioning, if he couldn't afford an attorney, one would be appointed by the Commonwealth at no cost to himself." The motion judge, crediting that testimony — and rejecting the defendant's testimony that he had been given no Miranda warnings — found that Sergeant Trudel "correctly advised the defendant of his rights to remain silent, to have counsel present, and to have counsel appointed if he was indigent." The judge denied the defendant's motion to suppress.

The defendant claims that the judge erred in denying his motion because missing from Sergeant Trudel's warnings (confirmed by the judge's findings about the specific warnings given) was the warning that any statement the defendant made could be used against him. We agree, and because the Miranda warnings were incomplete, the defendant's statements were inadmissible. See *Miranda* v. *Arizona*, 384 U.S. 436, 469, 471, 479 (1966) (warning that anything said can be used against individual "must" be given; it is "an absolute prerequisite to interrogation"; no statements procured through interrogation without valid waiver of Miranda rights are admissible). Accord *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 544, cert. denied, 537 U.S. 942 (2002); *Commonwealth* v. *Adams*, 389 Mass. 265, 267-270 (1983). See *Commonwealth* v. *Tavares*, 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982), quoting *Coyote* v. *United States*, 380 F.2d 305, 309-310 (10th Cir.), cert. denied, 389 U.S. 992 (1967) ("if [the Miranda] prerequisites have not been fully met, the confession is without more involuntary as a matter of law, hence inadmissible and insubmissible").

Where the Commonwealth was nonetheless allowed to introduce the defendant's statements at trial, in violation of the defendant's rights under the Fifth Amendment to the United States Constitution, see *Dickerson* v. *United States*, 530 U.S. 428 (2000) (reaffirming constitutional basis of Miranda rights), we examine the case to determine whether the erroneous admission was harmless beyond a reasonable doubt. See *Commonwealth* v. *Vuthy Seng*, *supra* at 548; *Commonwealth* v. *Cobb*, 374 Mass. 514, 521 (1978); *Commonwealth* v. *Coplin*, 34 Mass. App. Ct. 478, 483 (1993). We agree with the defendant that it was not.

(b) *Harmless error analysis*. In determining whether an error

of constitutional dimension is harmless beyond a reasonable doubt, we examine various factors, including the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt. See *Commonwealth* v. *Mahdi,* 388 Mass. 679, 696-697 (1983). See also *Commonwealth* v. *Sinnott,* 399 Mass. 863, 872 & n.8 (1987). Accord *Commonwealth* v. *Waite,* 422 Mass. 792, 801- 802 & n.9 (1996). In short, we analyze the case to see whether the error might have had an effect on the jury or contributed to the verdicts, and whether the Commonwealth's evidence was " 'merely cumulative' of evidence properly before the jury," *Commonwealth* v. *Sinnott, supra* at 872 n.8, or was overwhelming without the erroneously admitted evidence. See *Commonwealth* v. *Perez,* 411 Mass. 249, 260 (1991); *Commonwealth* v. *Perrot,* 407 Mass. 539, 548-549 (1990); *Commonwealth* v. *Marini,* 375 Mass. 510, 520-521 (1978). Here, the error was not harmless.

The Commonwealth's theory of the case was that the defendant actually possessed the drugs found on his person and that he constructively possessed the drugs and drug paraphernalia found in the house because he lived there.[8] See *Commonwealth* v. *Ortega,* 441 Mass. 170, 174-175 (2004) (defendant constructively possessed drugs found in apartment where evidence showed that defendant lived there). The defendant's theory was that the Commonwealth had failed to prove a sufficient nexus between him and the contraband found in the house because he did not live there — he lived with his girl

[8]Although the Commonwealth was not required to prove that the defendant necessarily *lived* in the house in order to show that he constructively possessed the contraband found there, see, e.g., *Commonwealth* v. *Schmieder,* 58 Mass. App. Ct. 300, 303 (2003) (evidence of defendant's property interest in premises not required); *Commonwealth* v. *Caterino,* 31 Mass. App. Ct. 685, 688, 689 (1991) (evidence that person "spent a great deal of time at" or "exercised control over the apartment or its contents" could be sufficient to prove constructive possession), the Commonwealth's theory was that the defendant in fact lived there and the defense focused on refuting that theory.

friend in Medford and had merely signed a lease and left some of his belongings at the house in Lowell in anticipation of moving there after the renovations were completed — and other people, including workers and current tenants, could have been responsible for the drugs. With those theories in mind, we examine the impact of the erroneously admitted testimony that the defendant lived in the house.

The defendant's statements, introduced by the Commonwealth, were of particular importance to the Commonwealth's case — and were especially damaging to the defendant's case — because they were the only direct evidence in an otherwise purely circumstantial case that the defendant lived in the house. See *Commonwealth* v. *Hosey*, 368 Mass. 571, 579 (1975) (erroneous admission of defendant's statements not harmless where, despite "substantial evidence pointing to the defendant as the perpetrator," evidence was "entirely circumstantial" and defendant "took the stand to deny any involvement in the incident"). Moreover, the improper testimony was introduced twice during trial: first through Sergeant Trudel and again through Detective Coughlin. Then, in closing argument, the prosecutor, while marshaling the circumstantial evidence of the defendant's occupancy of the house, said, "Ladies and gentlemen, you also heard from the police that the defendant . . . told them that he was living in that house and that he had rented it from Mr. Ignatowicz. . . . [H]e told them that he was living there, and that he had just rented it, which is consistent, I suggest to you, with all of the other evidence that we found." By introducing the defendant's improperly procured admissions twice during trial and then highlighting them in closing argument, the prosecutor unmistakably relied on them in a significant way. This was not surprising, precisely because the defendant's admissions to the police were the only direct evidence that he lived in the house.

That the defendant's inadmissible statements were *consistent* with the Commonwealth's otherwise circumstantial evidence does not mean those statements were *cumulative* of otherwise properly admitted evidence. Compare *Commonwealth* v. *Libran*, 405 Mass. 634, 643 (1989) ("no other trial witness testified to direct knowledge of how and when the defendant obtained a

knife, and thus the statements were not cumulative of other evidence"), with *Commonwealth* v. *Perez, supra* at 260 (erroneously admitted statements were merely cumulative where they "contain[ed] nothing of importance that was not also contained in the defendant's first, properly admitted, statements from his initial interrogation"). Moreover, in the circumstances of this case, where the error was the admission of the defendant's own statements — an issue decided adversely to the defendant before trial — there was no realistic possibility that the error could have been cured by a jury instruction.

As for whether the Commonwealth's evidence was otherwise so strong — overwhelming — as to nullify any effect the erroneously admitted statements might have had on the jury or the verdict, the answer is no. To be sure, the Commonwealth's circumstantial evidence was *sufficient* to prove the defendant constructively possessed the drugs, under the standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). See, e.g., *Commonwealth* v. *Lee*, 2 Mass. App. Ct. 700, 704 (1974) (evidence of defendant entering and leaving building several times over three-day period, presence of defendant's personal papers, and presence of men's clothing sufficient to prove constructive possession). But the question here is not whether the Commonwealth's circumstantial evidence was sufficient to support the convictions, but whether it was so powerful as to neutralize the erroneously admitted, sole direct evidence establishing the defendant's occupancy of the house. See *Commonwealth* v. *Cobb*, 374 Mass. 514, 522 (1978) ("The sum of the evidence presented against the defendant, although sufficient to withstand the defendant's motion for directed verdict, was not overwhelming"); *Commonwealth* v. *Delarosa*, 50 Mass. App. Ct. 623, 628 (2000) (circumstantial evidence connecting defendant to apartment where drugs were found, while sufficient, was not overwhelming).

Here the defendant mounted a tenable defense through his own testimony as well as that of two other witnesses. Although the defendant executed a lease to rent the house on April 15, approximately two weeks before the police searched it, the defendant made a plausible case that, at the time of the search, he had not yet begun living in the house because the house was

undergoing extensive renovation, was not yet fully habitable (for instance, the stove in the kitchen did not work), and other tenants had not yet moved out. As for Sergeant Trudel's testimony that, when he arrived at the house, the defendant struggled to get inside, the defendant denied any such attempt to enter the house. Although the police found some of the defendant's mail in the house, the mail was addressed to the defendant's girl friend's residence — where, according to the defendant and his girl friend, he was living at the time of the search. Regarding the clothes and other items found in the bedroom, the defendant denied that they were his, but did not deny having delivered some of his belongings to the house; he plausibly testified that he had delivered boxes of personal items to the house in anticipation of moving in, but that the boxes were sealed. As for the clothing and shoes in the bedroom closet, the defendant reasonably suggested to the jury that those items belonged to someone else, for example, one of the tenants who had not yet moved out.

In addition to considering the plausibility of the defendant's theory, a review of other cases demonstrating truly overwhelming evidence shows that the circumstantial evidence here misses the mark. Compare *Commonwealth* v. *Marini*, 375 Mass. 510, 521 n.12 (1978), quoting *Milton* v. *Wainwright*, 407 U.S. 371, 372-373 (1972) (noting that "overwhelming" evidence has been understood to mean evidence akin to three full confessions); *Commonwealth* v. *Cobb, supra* (erroneous admission of defendant's statement to police not harmless where evidence showed percipient witness able to identify defendant only after viewing three different collections of photographs); *Commonwealth* v. *Hosey, supra* (erroneous admission of defendant's statements not harmless where Commonwealth's other evidence was purely circumstantial and rebutted by defendant); and *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. 789, 795-799 (1985) (erroneous admission of defendant's photograph not harmless where circumstantial evidence, while "surely strong, . . . was not overwhelming"; photograph, "as a tangible link" to defendant, "was quite strong" and "more potent than the other identification evidence, which merely described physical characteristics common to many men"), with *Commonwealth* v.

*Ghee*, 414 Mass. 313, 317-320 (1993) (erroneous admission of defendant's statements harmless where other evidence included victim's decomposing body found in trunk of defendant's car while defendant was driving alone; defendant's clothing stained with blood and smelling of putrefaction; bloody clothing of victim in apartment that she and defendant shared; fingerprint linking defendant to firearm), *Commonwealth* v. *Perez, supra* at 260-261 (erroneous admission of defendant's inculpatory statements harmless where merely cumulative of properly admitted evidence — five eyewitnesses placed defendant at murder scene immediately after murder; two witnesses heard shots fired immediately after defendant and victim argued; three witnesses saw defendant flee murder scene immediately after murder; defendant told witness of his plan to kill and his guilt afterward); *Commonwealth* v. *Davis*, 58 Mass. App. Ct. 412, 414-417 (2003) (Miranda error harmless where Commonwealth's other evidence included heavily corroborated eyewitness account of controlled drug purchase from defendant). Considering that the Commonwealth's evidence other than the erroneously admitted statements was entirely circumstantial and that the defendant mounted a plausible, corroborated defense to that evidence, we conclude that the improper admission of the only direct evidence showing that the defendant lived in the house was not harmless beyond a reasonable doubt.

3. *Conclusion.* Because the defendant was not given a complete set of Miranda warnings, his statements to the police should have been suppressed. The admission of the defendant's statements was not harmless beyond a reasonable doubt. The defendant's convictions are reversed, the verdicts are set aside, and the case is remanded for a new trial.

*So ordered.*