NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12090


COMMONWEALTH  vs.  FRANKLIN CASTANO.



Essex.     April 7, 2017. - October 6, 2017.

Present:  Gants, C.J., Lenk, Gaziano, Budd, & Cypher, JJ.


Homicide.  Firearms.  Constitutional Law, Assistance of counsel,
    Harmless error.  Error, Harmless.  Practice, Criminal,
    Capital case, Assistance of counsel, Harmless error,
    Hearsay, State of mind.  Evidence, Hearsay, State of mind,
    Motive, Expert opinion, Qualification of expert witness.
    Witness, Expert.



Indictments found and returned in the Superior Court
Department on March 24, 2014.

A pretrial motion to suppress evidence was heard by Timothy
Q. Feeley, J., and the cases were tried before Mary K. Ames, J.


Elizabeth Caddick for the defendant.
Marcia H. Slingerland, Assistant District Attorney, for the
Commonwealth.


CYPHER, J.  A Superior Court jury convicted the defendant

of murder in the first degree on a theory of deliberate

premeditation, G. L. c. 265, § 1, and of unlawful possession of

a firearm, G. L. c. 269, § 10 (h).[1]  The defendant advances five arguments on appeal:  (1) his statements to police about the location of the gun involved in the case should have been suppressed; (2) the trial judge improperly admitted hearsay statements as motive evidence; (3) the Commonwealth's ballistics expert was not competent to testify about the trajectory of the shot that killed the victim; (4) the defendant was deprived of his right to counsel because his relationship with his attorney had deteriorated; and (5) the interests of justice require this court to exercise its power, under G. L. c. 278, § 33E, to reduce the conviction to murder in the second degree.  For the reasons discussed below, we affirm the convictions and decline to exercise our authority under § 33E.

Background.  On the morning of February 20, 2014, the defendant, accompanied by two friends, walked into the Lynn police station.  One of the friends, Alvaro Garcia, informed police that the defendant's girl friend was dead and that the defendant had killed her.  The defendant was placed under arrest, and police responded to the Peabody apartment that the defendant shared with his girl friend.  There, they found her

---

[1] The judge sentenced the defendant to the mandatory term of imprisonment for life sentence without parole on the murder conviction, and to a sentence of two years in a house of correction on the firearm conviction to be served forthwith. The defendant filed a timely notice of appeal.

dead with a gunshot wound to the head. Two spent casings were found nearby, but no firearm was observed or recovered.

The events immediately following the defendant's arrival at the police station were the subject of a motion to suppress, and we first summarize those facts as found by the motion judge. We then summarize the evidence at trial, with additional facts reserved for later discussion.

1. The motion to suppress. The motion judge found the following facts, which are not in dispute. The defendant, who is not fluent in English, was booked at the Lynn police station with the assistance of Officer Francisco Gomez, who is bilingual. Throughout the course of the day, Gomez administered Miranda rights to the defendant, in Spanish, at least four times, including at the Lynn police station and at the Peabody police station. Soon after the first provision of Miranda rights, the defendant invoked his right to counsel.

The questioning did not immediately cease. The defendant was subjected to two sets of questions at the Peabody police station without ever having the opportunity to speak to a lawyer. Both sets of postinvocation questions concerned the disposal of the firearm that police, at that time, believed the defendant had used to kill the victim.

The first set of questions came from Peabody police Officer Mark Saia, who asked the defendant where "the gun" was. The

defendant replied that he threw it out of his motor vehicle window near the apartment complex where the killing occurred. Saia told the defendant that it was important to locate the gun because of that area's proximity to places where children might be present. The officer asked the defendant for more detail about where he had disposed of the gun. The defendant said he had turned to the left out of the apartment complex and threw the weapon out the vehicle window near a dry cleaner. Saia communicated that information to other officers at the scene. They did not find the gun.

The second set of questions came from Peabody police Detective Stephanie Lane. Lane had responded to the apartment complex on the morning of the events in question. She was familiar with the area described by the defendant. She was aware that both a church (with a school and day care facility) and a preschool were located nearby. She also was aware that the apartment complex itself was home to a number of children. Lane further knew that police had not recovered the weapon from the apartment or from their subsequent search of its environs.

When Lane returned to the station, she spoke to the defendant in the holding cell area and essentially repeated the questions asked by Saia. The defendant provided the same information and described the firearm as silver in color. Lane asked if the defendant would be willing to accompany her and

other officers to help find the firearm. He agreed to cooperate. Police placed the defendant in the back of a cruiser and drove to the area adjacent to the apartment complex. The defendant pointed out the direction in which he had thrown the firearm. Still, police never recovered the weapon.

The motion judge ruled that the defendant's responses to these two sets of inquiries were admissible at trial under the public safety exception to the Miranda exclusionary rule, as first established in New York v. Quarles, 467 U.S. 649, 655-656 (1984). He concluded that (1) the Quarles exception extends to postinvocation questioning and (2) it applied here because officers had an objectively reasonable need to protect the public from danger when they asked the defendant about the location of the gun.

2. The evidence at trial. We summarize the facts at trial as the jury could have found them.

a. Communication with Garcia. Garcia, a friend of the defendant for several years, testified about communication he had had with the defendant on the night of the killing and the morning after. Garcia also knew the victim, having nicknamed her "Explosive" because she was "the kind of person you [could] meet and connect [with] right away" and "[a]lways happy."

On the night of February 19, 2014, Garcia was working at his job for a cleaning company. Around 10:30 P.M., the

defendant began posting comments directed at Garcia on a social networking Web site, one of which struck Garcia as unusual. As a result, Garcia telephoned the defendant, who said only that he would call Garcia later. About an hour later, the defendant called Garcia and asked him to come by the defendant's apartment because the defendant needed to talk to him. The defendant sounded "weird" and "nervous." Garcia tentatively agreed to come by the apartment, or at least call the defendant, when his shift ended at 2 A.M. on February 20.

The defendant subsequently sent Garcia another message, through the messaging application WhatsApp, asking if he had finished his shift yet. Garcia asked why the defendant wanted him to come by the apartment. The defendant replied that he had "problems" or "a thing on [his] hands." The defendant also sent an emoji[2] of a face with X's for eyes,[3] and the word "Explosive." At that point, Garcia knew that "something was happening," and he told the defendant that he would call the defendant after work.

---

[2] An emoji is "any of various small images, symbols, or icons used in text fields in electronic communication (as in text messages, [electronic ]mail, and social media) to express the emotional attitude of the writer, convey information succinctly, communicate a message playfully without using words, etc." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/emoji [https://perma.cc/QUC5-SA8E].

[3]

Garcia sent the defendant a text message when he was leaving work around 2 A.M., and again when he reached his home around 2:30 A.M., but the defendant did not respond to either. Garcia did not hear from the defendant again until around 7 A.M., when the defendant called on the telephone while Garcia was working at his second job. The defendant again told Garcia that he had "problems" -- "something serious" or "something big" -- and that he wanted Garcia to come by his apartment. At this point, the defendant sounded "desperate."

Garcia left work and went to the defendant's apartment in Peabody. When he arrived, the defendant opened the door to let Garcia in, turned, and said, "I'm fucked." Garcia asked what happened, and the defendant said, "Explosive is dead." The defendant told Garcia that the victim was "in the other room," but he did not explain what happened before Garcia got scared and decided to leave.

Garcia returned to his home in Lynn and spoke with his wife; they agreed to go to the Lynn police station. At that point, the defendant telephoned Garcia and said that he was on his way to Garcia's house. Garcia and his wife waited in the vehicle for the defendant to arrive, planning to accompany him to the police station.

When the defendant arrived, he leaned in the driver's side window of Garcia's vehicle. Garcia's wife asked the defendant

what had happened.  The defendant explained that he was counting money at a table, upon which there was a gun.  According to the defendant, the victim grabbed the gun and said, "I don't know why you have this in here."  The victim then "dropped" the gun back onto the table.  It fell off of the table, and the defendant "grabbed" it.  After grabbing the gun, the defendant said something along the lines of "leave me alone, asshole" and swung his arm backward.  The defendant said the motion caused him to shoot the victim, and then he got scared and a second shot fired into the wall.  The defendant told Garcia it was an accident and he wanted to "do the right thing" and surrender himself to police.

b.  Defendant's statements to police.  The testimony at trial regarding the defendant's statements to police was essentially consistent with the testimony at the suppression hearing, discussed above.  Officer Gomez and Detective Lane testified that the defendant told them that he "threw [the gun] out of the car" at some point after the incident.  Both Officer Saia and Detective Lane described police efforts to locate the gun based on information given to them by the defendant.

c.  Physical evidence.  Although police never recovered the weapon, the Commonwealth presented other pieces of physical evidence linking the defendant to the crime.  When police entered the apartment, it appeared relatively clean and

undisturbed, other than a small lamp near the victim's feet that had been knocked over and a suitcase on the floor of the room where the victim was found.

Photographs of the inside of the apartment showed that police discovered the victim lying face-down on a small couch, with a sweatshirt covering her head. Blood had pooled in the corner of the couch next to the victim's head and on the floor nearby. Police found one earring in a crevice of the couch; the other remained in the victim's left ear.

Police also located two spent shell casings inside the apartment -- one on the floor near the couch and one on a windowsill in the corner of the same room. They recovered two spent projectiles -- one from inside the arm of the couch, and one from inside the wall above the victim's feet.

The exhibits also included two pairs of examination gloves and one pair of winter gloves that police found sitting out on a coffee table and a bureau inside the apartment. The outside of one pair of examination gloves tested positive for gunshot residue.

d. <u>Motive evidence</u>. The Commonwealth's theory of motive was based largely on the testimony of two acquaintances of the victim -- a cousin and a friend. The cousin testified that she saw the victim on February 13 and 14, 2014. She testified that on February 13, the victim told her that, the night before, she

and the defendant had gotten into an argument over the way the defendant opened a bag of cotton balls. The argument progressed to the point where the victim told the defendant she wanted to end their relationship. According to the cousin, the victim also had received gifts from the defendant for their anniversary, on February 13, but had told the defendant that she did not want them.

The friend testified that, on the Monday before she was killed, the victim had told the friend that she was planning to end her relationship with the defendant and that his belongings were already packed. The victim said that "[s]he wanted him out of the apartment so she could continue her life without him."

There also was testimony from the leasing agent for the apartment complex where the defendant and the victim lived. The leasing agent testified that on the afternoon of February 19, 2014, the victim came into her office to obtain a roommate release form. The leasing agent provided the victim with the form, along with instructions for completing it.

e. Medical evidence. The medical examiner testified to her autopsy findings underlying her opinion that the victim died from a gunshot wound to the head. She described the entrance wound above the victim's right temple and the exit wound in the lower, left part of her skull. She also opined that the

entrance wound was a "contact wound," meaning the gun was fired while in contact with the victim's head.

The autopsy revealed other injuries. The victim had abrasions around her neck, roughly matching the pattern of a necklace she was wearing. The abrasions, along with petechial hemorrhages in the victim's eye and face, indicated possible ligature strangulation. The medical examiner also observed bruising and abrasions on the victim's right cheek, as well as a bruise on the back of her left hand.

f. The defense. The theory of the defense was that the victim's death was accidental. The defendant did not put on his own case. However, in addition to the evidence already discussed, the defendant, without objection, elicited testimony from Garcia and Garcia's wife about how the defendant had told them, before they all went to the police station, that the shooting was an accident. He argued in closing that the shooting was accidental and there was reasonable doubt about his alleged motive.

Discussion. 1. Defendant's statements to police. There is no dispute that the defendant invoked his right to counsel shortly after appearing at the Lynn police station on the morning of February 20, 2014, and well before officers asked him about the location of the gun. The Commonwealth conceded at the suppression stage that because police continued to question the

defendant after he had invoked his right to counsel, his statements in response to those questions were not admissible under the general parameters of Edwards v. Arizona, 451 U.S. 477, 484-485 (1981).

However, the Commonwealth urges this court to adopt the reasoning of the motion judge -- in particular, that the public safety exception to the Miranda exclusionary rule, announced by the United States Supreme Court in Quarles, 467 U.S. at 655-656, authorizes the admission of the defendant's postinvocation statements to police regarding the whereabouts of the gun. The defendant argues that this court has never, and should not now, apply Quarles to post-Miranda, postinvocation questioning. He further argues that even if Quarles applied in such a scenario, it should not apply here because there was no objectively reasonable concern that police or the public faced any immediate danger from the gun that the defendant discarded.

Although ably argued by both sides, we need not decide whether Quarles might apply in a postinvocation setting such as this one, or, if so, whether the circumstances here would meet the requirements of the public safety exception. Even if we assume, without deciding, that it was constitutional error to admit the defendant's postinvocation statements and the evidence about the ensuing, but fruitless, police search for the gun, any such error would not require reversal in this case.

Where the Commonwealth introduces evidence in violation of a defendant's constitutional rights, "we examine the case to determine whether the erroneous admission was harmless beyond a reasonable doubt." Commonwealth v. Dagraca, 447 Mass. 546, 552 (2006). In order to answer that question, we look to several factors, including, as relevant here, the importance of the evidence in the prosecution's case, the relationship between the evidence and the premise of the defense, and the weight or quantum of evidence of guilt. Id. at 552-553 (listing factors). "An assertion that the error is harmless beyond a reasonable doubt is most particularly vulnerable where the over-all strength of the Commonwealth's case radiates from a core of tainted evidence." Commonwealth v. Tyree, 455 Mass. 676, 701-702 (2010). On the other hand, an error may be harmless beyond a reasonable doubt where the Commonwealth's evidence is so "overwhelming" that it "nullif[ies] any effect the erroneously admitted [evidence] might have had on the jury or the verdict." Dagraca, supra at 555.

The defendant argues that the prejudice calculus tips in his favor because the Commonwealth presented testimony from several police officers not only regarding the defendant's statements to them about throwing away the gun, but also -- and perhaps more harmfully -- about their extensive, yet unsuccessful, search effort that resulted from those statements.

Indeed, the Commonwealth's case included testimony that the search involved personnel from the State police and at least four municipal police departments, a canine unit, and a front-end loader digging through the snow over the course of about four hours, all in a fruitless search for the gun. All of this provided a foundation for the prosecutor to argue, in closing, that the defendant "manipulated the police" into "a wild goose chase looking for a gun."

Nevertheless, we are satisfied that the evidence of premeditation was so "overwhelming" as to "nullify any effect" that this evidence might have had on the jury or the verdicts. Dagraca, 447 Mass. at 555. See id. at 556-557 (collecting cases). The gun itself was not an important piece of evidence in the case, given that it was never recovered and that the victim's cause of death -- a gunshot wound to the head -- was never in dispute. Rather, it is clear to us that, as laid out below, the physical evidence, the motive evidence, and the evidence of the defendant's communications with Garcia formed the center of gravity of the Commonwealth's case. The defendant's statements to police and the ensuing search for the gun were peripheral to it, and not a "core of tainted evidence," Tyree, 455 Mass. at 702, from which the verdicts flowed.[4]

---

[4] Although our determination is far from mathematical, a survey of the prosecutor's closing argument illustrates this

Moreover, the challenged evidence was not totally inimical to the defendant's own theory of the case. Indeed, defense counsel, in closing, directed the jury's attention to the fact that the defendant had surrendered himself to police and later helped them search for the gun. The implication of this argument was that a person who was guilty of premeditated murder would not do these things, but one who had committed an accidental killing would.

That articulation of the issue points to the crux of the defendant's argument on prejudice: that the jury could have used the "wild goose chase" evidence as a reason to disbelieve his version of events (the shooting was accidental) and instead believe the Commonwealth's version (the shooting was premeditated). However, the evidence supporting deliberate premeditation was plentiful and potent, and each piece provided the jury with a reason to reject the defendant's theory of accident that was wholly independent of the "wild goose chase" evidence.

As already discussed, the victim died of a contact gunshot wound to the head. And, as discussed in more detail below, the evidence showed that this gunshot was likely fired in a "downward trajectory" through the victim's head and into the arm

---

point. Her closing argument spanned 268 lines of transcript; the "wild goose chase" evidence took up about ten lines, or about four per cent, of the argument.

of the couch.  The victim was found lying face-down, with her head pressed into the corner of the couch and her feet in the air.  All of this suggests that the shooter had leverage over the victim, forced her head against the armrest of the couch, and held the gun against her temple before firing.  That version of events, as corroborated by the physical evidence, flatly contradicts the story that the defendant told Garcia -- that he accidentally fired the gun when he swung his arm backward while seated at a table.

Similarly, the medical examiner's extensive testimony about the abrasions on the victim's neck, the petechial hemorrhages in her face, and the bruising to her head and hand refutes the defendant's accident theory.  These injuries, along with the fact that one of the victim's earrings was found in the seam of the couch while the other remained in her ear, indicate that some sort of struggle, and possibly strangulation, took place on the couch before the shooting.  Again, this evidence cannot be squared with the story that the defendant told Garcia.

The Commonwealth's case also included substantial evidence of motive.  As discussed in more detail below, the jury reasonably could have inferred that the defendant was aware that the victim wanted to end their relationship and kick him out of the apartment they shared, and that this motivated the killing.

This evidence, if believed, would give the jury yet another reason to reject the defendant's theory of accident.

The defendant's communication with Garcia also was irreconcilable with an accidental shooting. Between 10:30 P.M. on February 19 and 2 A.M. on February 20, the defendant initiated numerous communications with Garcia -- including sending an emoji face with X's for eyes alongside the victim's nickname "Explosive" -- that suggested the shooting had already occurred. Yet, there was no evidence that the defendant ever called 911 or otherwise sought to aid the victim. Instead, when Garcia finally visited the apartment after 7 A.M., the defendant opened the door and said, simply, "I'm fucked." Shortly after, when Garcia told the defendant of his intention to call the police, the defendant immediately asked him not to, pleading, "[D]o not do that to me."

Finally, there was some evidence that the defendant may have manipulated the crime scene. In particular, when police searched the apartment, they observed three pairs of gloves and a spray bottle of cleaner sitting out in the open, along with numerous aromatic candles burning.

The totality of the evidence so overwhelmingly refutes the defendant's accident defense that we are convinced beyond a reasonable doubt that no reasonable jury would have been affected in their deliberations by the evidence the admission of

which is alleged to be constitutional error.  Accordingly, we conclude that the Commonwealth's properly admitted evidence was "so powerful as to neutralize," Dagraca, 447 Mass. at 555, any prejudice that may have arisen from the admission of the defendant's statements about the location of the gun and the resulting search.

2.  Hearsay statements.  The defendant next argues that the trial judge abused her discretion in admitting statements of the victim, to her cousin and her friend, that she was planning to end her relationship with the defendant because there was no evidence that the defendant was aware of this plan.  We discern no error.

There is no dispute that the victim's statements to her cousin and her friend ordinarily would constitute hearsay.  See generally Mass. G. Evid. §§ 801(c), 802 (2017).  However, in certain circumstances, an exception to the hearsay rule permits the admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim.  See Commonwealth v. Qualls, 425 Mass. 163, 167 (1997), S.C., 440 Mass. 576 (2003).  Such evidence is admissible "when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it."  Id.  There need not be direct evidence that the defendant learned of the victim's state of mind, so long as the

jury reasonably could have inferred that he or she did learn of it. <u>Commonwealth</u> v. <u>Franklin</u>, 465 Mass. 895, 907 (2013).

Here, there was adequate evidence for the jury to infer that the defendant was aware of the victim's plan to end their relationship. In particular, the evidence showed that a suitcase lay in the middle of the floor of the room where the victim's body was found. The evidence also showed that, the afternoon before the killing, the victim obtained a roommate release form from the apartment leasing agent, and received specific instructions on how to fill it out in order to remove the defendant from the lease. Police later recovered the form from the victim's automobile, although there was no evidence that the defendant actually saw it. Further, even in the defendant's own description of the purportedly accidental shooting, he and the victim were arguing in the moments leading up to it.

These pieces of evidence, considered together and in the context of the location and manner of the victim's death, provided the jury with a sufficient foundation to reasonably infer that the victim made the defendant aware of her desire to end their relationship and for the defendant to move out of the apartment not long before the killing occurred.[5] Compare

---

[5] The Commonwealth asserts that additional hearsay statements -- testimony to the effect that the victim told her

Franklin, 465 Mass. at 907-908 (defendant's statements permitted inference that he learned of victim's threat and that it was motive in killing); Commonwealth v. Sharpe, 454 Mass. 135, 142 (2009) (defendant's request to friend for help getting new apartment reasonably implied he was aware of victim's plan to move without him to new apartment); Commonwealth v. Cruz, 424 Mass. 207, 212 (1997) (proper evidence of "threats" and "discord" in relationship demonstrated respective states of mind of victim and defendant); Commonwealth v. Weichell, 390 Mass. 62, 74 (1983), cert. denied, 465 U.S. 1032 (1984) (defendant's statements and actions, including heated argument with victim in week before murder, permitted inference that defendant and victim had communicated hostile intentions toward each other); Commonwealth v. Borodine, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977) (defendant's statements to others concerning argument with victim over their relationship, coupled with victim's willingness to tell third parties that her

cousin and her friend that she had told the defendant of her desire to end her relationship with him -- lent further support to the inference that the defendant was made aware of the victim's state of mind.  Compare Commonwealth v. Borodine, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977) ("If the victim was willing to tell third persons that her relationship with the defendant had deteriorated and that she had told or would tell the defendant that their relationship would end, it is inferable that by word or action, or both, she communicated her feelings to the defendant").  Given the nonhearsay basis for the inference of the defendant's awareness discussed in the text, we need not reach this question.

relationship with defendant had deteriorated, permitted inference that defendant was made aware of victim's state of mind).

Of course, the jury were not required to make this inference. But the fact that they permissibly could have means that "[i]t was within the judge's discretion," Commonwealth v. Bins, 465 Mass. 348, 366 (2013), to admit the victim's statements under the state-of-mind exception to the hearsay rule. See Franklin, 465 Mass. at 908. Moreover, the judge issued timely and forceful instructions to the jury regarding the limited purpose of this evidence. See Bins, supra. There was no error.

3. Shot trajectory. The defendant also argues that the Commonwealth's ballistics expert was not qualified to offer an expert opinion on the trajectory of the shot that killed the victim. In particular, he takes issue with the fact that a member of the firearms identification section of the State police was permitted to testify that, in his opinion, the shot that killed the victim traveled in a "downward trajectory." There was no objection to that testimony at trial, nor is there any indication that defense counsel sought a Daubert-Lanigan hearing to investigate the trooper's qualifications to offer this opinion. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Commonwealth v. Lanigan, 419 Mass. 15 (1994).

Typically, a trial judge has wide discretion in qualifying a witness to offer an expert opinion and that determination will not be upset on appeal if any reasonable basis appears for it. Commonwealth v. Avila, 454 Mass. 744, 764 (2009), quoting Commonwealth v. Rice, 441 Mass. 291, 298 (2004). Here, the record demonstrates that the judge was well within her discretion in admitting the opinion of the Commonwealth's ballistics expert because that opinion did not require qualifications beyond those the witness possessed. The evidence showed that the victim was found lying on her stomach with the left side of her face pressed into the corner of a small couch. The medical examiner testified that the fatal shot entered the victim's skull near the right temple and exited through the back left side of the skull. There was a bullet hole, with hairs around it, in the armrest nearest the victim's head. Investigators retrieved a bullet buried inside the armrest of the couch.

Considering these pieces of evidence together, mere common sense permits the inference that the bullet traveled in a downward trajectory. That is, it does not take an expert to draw a straight line between three points -- from the entrance wound on the victim's right temple, through the exit wound on the left side of her skull, to the bullet's final resting place inside the armrest of the couch. Compare Commonwealth v.

Pasteur, 66 Mass. App. Ct. 812, 826-827 (2006) (discussing expert testimony of State police firearms examiner on ricochet trajectory of bullet).  At most, drawing such a conclusion might require basic familiarity with the operation of firearms. Compare Commonwealth v. Lodge, 431 Mass. 461, 469 (2000), citing Cammon v. State, 269 Ga. 470, 471-474 (1998) (testimony about direction in which blood typically falls "may well be within the general knowledge" of experienced police homicide investigator, provided appropriate foundation questions are asked regarding investigator's experience).  Assuming such familiarity was required, this witness clearly possessed it, having test-fired over 1,000 weapons and having worked as a State police ballistician for over eight years.  See Commonwealth v. Fritz, 472 Mass. 341, 349 (2015) (officer's experience in firearms identification supported judge's determination that officer satisfied foundational requirements to qualify as expert). There was no error.

4.  Right to counsel.  The defendant further argues that the trial judge abused her discretion by denying his request for new counsel after jury selection, but before trial began.  The request was premised on the defendant's assertion that his attorney was acting ineffectively and that communication between the two had broken down beyond repair.  On appeal, the defendant

mainly takes issue with the judge's suggestion that his last-minute request for a new lawyer was a delay tactic.

The defendant states the correct standard of review:  a defendant's motion to discharge counsel, when made on the eve of trial, is a matter left to the sound discretion of the trial judge.  Commonwealth v. Tuitt, 393 Mass. 801, 804 (1985).  However, his argument misconstrues what happened below.  In fact, the trial judge stated -- on the record and in considerable detail -- that she had been closely observing the interactions between the defendant and his attorney, and that she saw "nothing to indicate . . . that any relationship ha[d] broken down."  To the contrary, she determined that the defendant's attorney had acted with "the highest degree of professionalism," went "beyond the call of duty," and "communicat[ed] quite effectively" with his client.  Given these findings, the judge's decision to deny the defendant's request for new counsel fell squarely within "the range of reasonable alternatives," L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), available to her.

5.  Review under G. L. c. 278, § 33E.  Finally, the defendant contends that a conviction of murder in the second degree would be more consonant with justice.  As already discussed, ample evidence supported the jury's finding of deliberate premeditation.  After a thorough review of the

record, we see no reason to exercise our power under G. L.

c. 278, § 33E, to reduce the verdict.

<u>Judgments affirmed</u>.